IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN CUTONILLI,

*Plaintiff*,

v.

FEDERAL TRANSIT
ADMINISTRATION, *et al.*,

*Defendants*.

Civil Action No. ELH-13-2373

**MEMORANDUM OPINION**

This case arises from a dispute concerning the Baltimore Red Line Project, a proposed east-west mass transit line to serve Baltimore City and Baltimore County ("Red Line Project" or "Project"). *See* generally ECF 1 ("Complaint").[1] The plan for the Project ("Preferred Alternative"), announced in the Record of Decision issued by the Federal Transit Administration on February 28, 2013 ("ROD"),[2] is "a 14.1-mile light rail transit line [with 19 stations, running east-west] from the Centers for Medicare & Medicaid Services (CMS) in Baltimore County to the Johns Hopkins Bayview Medical Center campus in Baltimore City." AR1_000001, ROD.

Plaintiff John Cutonilli, who is self-represented, has sued the Federal Transit Administration ("FTA") and the Maryland Transit Administration ("MTA") (collectively "Agencies"), defendants, alleging that they failed to comply with "federal environmental laws"

---

[1] Subject matter jurisdiction is founded on 28 U.S.C. § 1331 and 28 U.S.C. § 1346. *See* ECF 1 ¶ 3, Complaint. Under 28 U.S.C. § 1331, federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Pursuant to 28 U.S.C. § 1346(a)(2), federal district courts have jurisdiction over "[a]ny civil action against the United States."

[2] A record of decision identifies an agency's final selection of the preferred plan for a project and the basis for its decision. 40 C.F.R § 1505.2(a).

in regard to the Project.  ECF 1, Complaint.  He complains that defendants improperly rejected his proposed alternative for the Project.

According to plaintiff, "no single mode" of transit is appropriate.  *Id.* ¶ 13, Complaint. Among other things, plaintiff claims his proposal made "extensive reuse of existing transit corridors," *id.* ¶ 22, and "uses an existing transit corridor rather than forcing the route through a dense section of the city. . . ."  *Id.* ¶ 21.  Moreover, plaintiff alleges that defendants have, *inter alia*, failed to "rigorously explor[e] and objectively evaluat[e] all reasonable alternatives" prior to making their selection as to the Preferred Alternative for the Project, *id.* ¶ 29, in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and its implementing regulations, at 40 C.F.R. § 1500 *et seq.*

Plaintiff also contends that defendants "failed to insure the professional integrity, including scientific integrity" of the Project's environmental impact statement,[3] in violation of 40 C.F.R. § 1502.24.  ECF 1 ¶ 29, Complaint.   In addition, plaintiff maintains that defendants "provided unsubstantiated responses," in violation of 40 C.F.R. § 1503.4, and did not consider or respond appropriately to public input, including his input, or adequately involve the public in the Project planning process, in violation of 40 C.F.R. § 1506.6.  *Id.* ¶ 29; *see id.* ¶¶ 23-24.

Plaintiff seeks, *inter alia*, (1) a declaratory judgment that defendants' environmental impact statement in connection with the Project is "legally inadequate"; and (2) an injunction directing defendants to withdraw the ROD, which approved the Preferred Alternative, and to prepare a supplemental environmental impact statement "that includes all reasonable alternatives."  *See id.* at 9 (Prayer for Relief).

---

[3] As discussed, *infra*, an environmental impact statement is a document required by NEPA, which "shall provide full and fair discussion of significant environmental impacts . . . ," 40 C.F.R. § 1502.1, of certain federal actions.  *Id.* § 1502.4.

The central issues in this dispute focus on whether the Agencies' process for selecting the Preferred Alternative and preparing an environmental impact statement for the Project complied with NEPA. These issues implicate plaintiff's claim that his proposal was not adequately considered or addressed. Notably, this is *not* an action to "derail" the entire Project. Indeed, the practicality, economic feasibility, or wisdom of the Red Line Project are *not* issues before this Court.

Both defendants have moved for summary judgment. The MTA's motion (ECF 44) is supported by a memorandum of law (ECF 44-2, "MTA Memo."). I shall refer to ECF 44 and ECF 44-1 collectively as the "MTA Motion." The FTA's motion is at ECF 45, and is also supported by a memorandum of law (ECF 45-1, "FTA Memo."). I shall refer to ECF 45 and ECF 45-1 collectively as the "FTA Motion." And, I will refer to the MTA Motion and the FTA Motion collectively as the "Motions." Plaintiff filed a "Motion in Opposition to the Motions for Summary Judgment" (ECF 47), supported by a "Memorandum" (ECF 47-1) (collectively, "Opposition"). Both defendants filed replies. *See* ECF 50 ("MTA Reply"); ECF 51 ("FTA Reply").

The parties' submissions focus primarily on the Administrative Record. It was compiled and submitted by the FTA, and consists of nineteen DVD's that contain over 145,000 pages of documents.[4] For the convenience of the reader, I have appended to the Opinion a glossary of

---

[4] The Administrative Record is divided into four categories of documents: "AR1," "AR2," "AR3," and "AR4." In an affidavit dated April 25, 2014, ECF 38-1, Brigid Hynes-Cherin, FTA Regional Administrator, describes the first three categories of documents. She explains that the documents in AR1 include the ROD, the final environmental impact statement, and the draft environmental impact statement. ECF 38-1 ¶ 4(a). She characterizes the documents in AR2 as "project file documents that relate to the preparation" of the ROD, the final environmental impact statement, and the draft environmental impact statement. *Id.* ¶ 4(b). She describes the documents in AR3 as "email communications related to the development of the

terms that appear in the Administrative Record and this Opinion.

The Motions have been fully briefed, and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motions.

## I.  FACTUAL BACKGROUND

The factual background is drawn primarily from the Administrative Record. The documents in the Administrative Record span more than ten years. Due to the size of the Administrative Record—more than 145,000 pages—it does not appear electronically on the Court's CM/ECF system. ECF 38 ("Notice of Lodging Administrative Record"); ECF 42 ("Notice of Lodging Supplemental Administrative Record").[5]

### A.  The Parties; The Regulations

Cutonilli is a professional engineer who resides in Baltimore. ECF 1 ¶ 5, Complaint. He lives within the corridor to be served by the Red Line Project. *Id.*

The Maryland Transit Administration is an agency of the Maryland Department of Transportation. *Id.* ¶ 7. It served as the Project sponsor. AR_000001, ROD. In that capacity, the MTA assisted in the alternatives screening process, and it prepared various technical analyses for inclusion in the environmental impact statement ("EIS"), discussed *infra*. *Id.* at ARI_000002.

The Federal Transit Administration is an agency within the United States Department of

---

NEPA documents for this Project." *Id.* at ¶ 4(c). She also notes these emails were "collected from FTA, MTA and Project consultants." *Id.*

The fourth category of documents, AR4, was submitted as a supplement to the Administrative Record. *See generally* ECF 42. In a second affidavit dated June 26, 2014, Ms. Hynes-Cherin describes the documents in AR4 as "additional FTA documents," including "a set of notes, two letters, and one email." ECF 42-1 ¶ 5.

[5] The Administrative Record is paginated with Bates numbering indicating the category of the document. I have cited to the Bates page numbers.

Transportation.  ECF 1 ¶ 6, Complaint.  It served as the "lead federal agency" in the environmental review of the Project.  AR_000001, ROD.  In its capacity as lead agency, the FTA was responsible for supervising the preparation and issuance of the Project's EIS, in compliance with NEPA.  40 C.F.R. § 1501.5(a).

Title 40 of the Code of Federal Regulations is titled "Protection of Environment." Chapter V concerns the "Council on Environmental Quality" ("CEQ").  The CEQ is "the executive agency responsible for promulgating regulations that implement NEPA." *Defender of Wildlife v. N.C. Dep't of Transportation*, 762 F.3d 374, 393 n.12 (4th Cir. 2014); *see* 42 U.S.C. § 4342; 42 Fed. Reg. 26967 (May 25, 1977).[6]  Part 1500 of Title 40 is applicable here.  When interpreting NEPA, "courts give these regulations 'substantial deference . . . .'" *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005) (quoting *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)).

Prior to taking any "action[ ] with effects that may be major and which are potentially subject to Federal control and responsibility," 40 C.F.R. § 1508.18, an agency is required to prepare an EIS, both in draft and in final form.  *Id.* § 1502.4; *see* §§ 1502.09; 1502.10.  Actions considered major are "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . . ."  *Id.* § 1508.18(a).

An EIS is a decision-making tool that, *inter alia*, must provide a "full and fair discussion of significant environmental impacts" of the proposed federal action, and "shall inform

---

[6] The Supreme Court has explained:  "In 1977, President Carter directed that CEQ promulgate binding regulations implementing the procedural provisions of NEPA.  Exec. Order No. 11991, 3 CFR 123 (1977 Comp.).  Pursuant to this Presidential order, CEQ promulgated implementing regulations."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989).  These CEQ regulations are codified at 40 C.F.R. § 1500 *et seq.*

decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.* § 1502.1. Among other things, the EIS must include a statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding . . ." through the proposed federal action. *Id.* § 1502.13.

The preparation and publication of the EIS are completed in four stages: a notice of intent that an EIS will be prepared and considered; a draft EIS; a final EIS; and a record of decision. *Id.* §§ 1501.7; 1502.9; 1505.2. The notice of intent is published in the Federal Register. *Id.* § 1501.7. Its publication signals the initiation of the scoping phase. During the scoping phase, public outreach is performed to identify the major issues implicated by a project and to be analyzed in depth by the EIS. *Id.* The draft EIS provides a detailed description of the project proposal, a statement of the purpose and needs of the project, reasonable alternatives, and the affected environment. *Id.* §§ 1502.9; 1502.10. It also presents analysis of the anticipated beneficial and adverse environmental effects of the alternatives. *Id.* § 1502.10.

Following a formal comment period with respect to the draft EIS, the final EIS is developed and issued. *Id.* § 1502.9(b). The final EIS "shall respond to comments", *id.*, received with respect to the draft EIS. § 1502.9(a); *see also* § 1503 (pertaining to comments). The final EIS shall also identify, based on information and analysis, the agency's "preferred alternative or alternatives" for the project. *Id.* § 1502.14(e). Section 1502.14 states that this analysis of alternatives is "the heart" of the EIS.

The final step of the EIS process is the publication of the record of decision. The ROD sets forth an agency's final selection of a plan for a project. *Id.* § 1505.2(a). It also identifies, *inter alia*, the "environmentally preferable" alternative for the proposed federal action. *Id.* § 1505.2(b). In addition, the record of decision shall identify all alternatives that were considered

by the agency in reaching its decision, an explanation of practicable mitigation measures to ameliorate detrimental environmental effects identified in the scoping process, and a program to implement any mitigation measures. *Id.* § 1505.2(b)-(c).

"An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations. . . ." 40 C.F.R. § 1505.2(b). In selecting a project plan, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated [in the EIS], the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citations omitted).

As noted, the FTA issued the ROD on February 28, 2013. It approved the Agencies' Preferred Alternative for the Red Line Project. AR1_000001-001230, ROD. Pursuant to a CEQ regulation entitled "Mandate," 40 C.F.R. § 1500.3, "[i]t is the [CEQ's] intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact . . . . Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action."

### B.  Project Purpose

The FTA and the MTA jointly developed the Project to improve public transit efficiency in the "project study corridor," which extends at its western terminus from the vicinity of the Centers for Medicare and Medicaid Services in Baltimore County eastward to the Johns Hopkins Bayview Medical Center campus in Baltimore City" ("Study Corridor" or "Corridor").[7]  *Id.* at

---

[7] Throughout the Administrative Record, the Corridor is referred to variously as the "project study corridor," the "Red Line Transit Corridor," or "Project Corridor." The Corridor has been described generally as the area between "the Social Security/Woodlawn area in western

AR1_000003.  Most of the Corridor is within Baltimore City, but a four-mile segment is located within Baltimore County.   AR1_001296, Final Environmental Impact Statement, dated December 4, 2012 ("FEIS"); AR1_009262, Alternatives Analysis/Draft Environmental Impact Statement dated September 2008 ("AA/DEIS").

As to the objective of the Project, the statement of purpose as listed in the Record of Decision provides, AR1_000003, ROD:[8]

- Improve transit efficiency by reducing travel times for transit trips in the corridor
- Increase transit accessibility in the corridor by providing improved transit access to major employment and activity centers
- Provide transportation choices for east-west commuters in the corridor by making transit a more attractive option
- Enhance connections among existing transit routes in the corridor
- Support community revitalization and economic development opportunities in the corridor
- Help the region improve air quality by increasing transit use and promoting environmental stewardship

The Project's statement of needs as stated in the Record of Decision provides, AR1_000003, ROD: [9]

- Roadway congestion contributes to slow travel times for automobiles and

---

Baltimore County, downtown Baltimore, and Fells Point/Patterson Park in southeastern Baltimore City." AR2_1006121, Scoping Process Report dated October 2004.  However, the Corridor has also been described, in greater detail, as follows, *id.* at AR2_100622:

The headquarters of the Social Security Administration (SSA) is approximately 2 miles east of CMS. The corridor extends eastward following the U.S. 40 corridor through west Baltimore, downtown Baltimore, Fells Point, and to Patterson Park at its eastern-most terminus.

Although the Project is intended to improve transit efficiency in the Corridor, the precise parameters of the Corridor are not material to this Opinion.

[8] An identical statement of purpose appears in the FEIS.  AR1_001297-AR1_001298, FEIS.

[9] An identical statement of needs appears in the FEIS.  AR1_001298, FEIS.

buses in the corridor

- Lack of convenient transit access to existing and future activity centers in the corridor, including downtown Baltimore, Fell's Point,[10] and Canton, as well as employment areas in Baltimore County to the west of Baltimore
- Lack of viable transit options for east-west commuters in the corridor
- Lack of connections from existing transit routes (including Central Light Rail, Metro, MARC,[11] and bus network) to the I-70 travel market on the west side of the corridor, and to the I-95 and East Baltimore travel markets on the east
- Need for economic development and community revitalization in communities along the corridor, both in Baltimore County and in Baltimore City
- Need to support the regional goal of improving air quality by providing alternatives to automobile usage

### C.  Environmental Planning; Alternatives Screening Process

The development of the Red Line Project began in 2002, when the Baltimore Region Rail System Plan Advisory Committee issued its *Baltimore Region Rail System Plan*.   *Id.* at AR1_000004.   The plan recommended expansion of the existing rail service system and prioritized the development of the Red Line as the "first east-west rail transit line in Baltimore." *Id*.   Shortly thereafter, the Baltimore Region Transportation Board ("BRTB"), the official Metropolitan Planning Organization for the Baltimore region, incorporated an east-west rail transit line into its Long-Range Transportation Plan.[12]  *Id*.

---

[10] At various points in the Administrative Record, Fell's Point is also spelled Fells Point. This discrepancy is not material.

[11] MARC is an acronym for "Maryland Area Regional Commuter," *i.e.*, trains that service the Baltimore-Washington, D.C. corridor.

[12] "A Long-Range Transportation Plan ['LRTP'] sets forth the transportation improvements scheduled for funding over the next 20 year planning horizon.  The plans are prepared through regional collaboration and serve as the vision for the region's transportation systems and services."  ECF 45-1 at 10 n.3, FTA Memo.

The BRTB considered the Red Line an integral part of its LRTP and envisioned it as a transit line with the following layout, AR1_009283, AA/DEIS:

Since the inception of the Project, a key criterion of the analysis of viable alternatives is whether the plan would qualify for funding under the federal New Starts program.  New Starts is a discretionary, federal funding program that supports locally planned and operated transit projects.  AR1_001307, FEIS; *see* 49 U.S.C. § 5309(b).  To qualify for New Starts funding, a project must be "cost effective," an FTA measure of the "long-term benefits of the proposed project compared to the capital and operating costs of the project."  AR1_006668, FEIS, Appendix G, Heavy Rail Technical Memorandum dated February 2008 ("Heavy Rail Technical Report").

On April 11, 2003, the FTA and the MTA published a Notice of Intent ("Notice") to prepare a draft environmental impact statement ("DEIS")[13] for the Red Line Project, described as the first east-west transit line in Baltimore.[14]  68 Fed. Reg. 17855, Notice.  The purpose of the DEIS was to "assess the impacts of potential transit alternatives" in the Corridor, which "extends from the Social Security complex in Baltimore County through the Baltimore City Central Business District (CBD) to Patterson Park in Baltimore, MD."  *Id.*  The Notice stated that the DEIS would "examine and evaluate rail, bus rapid transit (BRT), transportation systems management and transportation demand management (TSM/TDM) strategies, and a no-build

---

[S]tations near major employment centers in downtown Baltimore, Inner Harbor East, the Social Security Administration complex, the University of Maryland professional schools, and the adjacent hospital complex; improved public transit for many Baltimore City and Baltimore County residential neighborhoods; connections to existing Metro, Light Rail and MARC stations; and proximity to recreational activity points of interest, such as Oriole Park at Camden Yards, M&T Bank Stadium and the Hippodrome Theater.

[13]  When issued in September 2008, the full title of the DEIS was the Alternatives Analysis/Draft Environmental Impact Statement or AA/DEIS.

[14]  Simultaneously, the MTA initiated the scoping process for the Green Line, a separate proposed public transit project in Baltimore.  AR2_100621, Scoping Process Report dated October 2004.

alternative.  Tunnel, surface, and/or aerial construction options will be considered for rail and BRT alternatives." *Id.*; *see* AR1_001306-AR1_001307, FEIS.

The publication of the Notice launched the Project's scoping phase, an "ongoing public outreach process" that lasted for years, during which the Agencies sought public feedback on issues implicated by the Project.  AR1_001307, FEIS; *see* AR1_001839, FEIS; AR1_009392, AA/DEIS.  Scoping meetings for the Project were held throughout the Corridor in May and June 2003, including a regulatory agency meeting at the Baltimore Metropolitan Council and five public meetings at various locations.  AR1_000016, ROD.  The scoping process generated over 150 written comments from the public, elected officials, and federal, state, and local regulatory agencies.  *See* AR2_100638-100646, Scoping Process Report dated October 2004.  The scoping process also "identified initial alignments and transit modes to consider for the Red Line." AR1_001307, FEIS.

According to the MTA, "[o]ver the next few years, the public outreach process continued."  ECF 44-2 at 4, MTA Memo.  In its motion, MTA elaborates on the Agencies' efforts to encourage public participation, stating, *id.* (citations to the Administrative Record omitted):

> A series of Public Open Houses[15] and Community Workshop meetings in the Project area were held every Spring and Fall to promote community wide exchange of information.  The FTA and MTA also conferred extensively with other Federal, State and Local Regulatory, Historic and Cultural Resource Agencies. MTA worked with 70 different community organizations, non-governmental organizations, academic and business interests and elected local officials to develop the "Red Line Community Compact." The Compact was designed to develop community-based implementation goals and strategies for the Project through a collaborative, public process.

> Between 2005 and 2007, the FTA and the MTA performed "an alternatives screening

---

[15] Throughout the Administrative Record, "Public Open House" also appears as "public open house" or simply "open house."

process which identified a range of alternatives for detailed study in the AA/DEIS . . . ." AR1_000002, ROD.  Throughout the screening process, when assessing the viability of various alternatives for the Project, the FTA and the MTA measured the proposals against the following criteria, AR1_001308, FEIS (internal reference omitted):

- Ability to address project Purpose and Need;
- FTA New Starts criteria;
- Engineering & cost - such as meets engineering design requirements and avoids higher capital cost;
- Extent of environmental impacts to parklands, air quality, noise, historic properties, and other resources;
- Mobility & operational factors such as travel time, traffic, transit connections
- Accessibility for population & jobs; and
- Public input.

According to the FEIS, based on a preliminary screening, two modes of transportation— commuter rail and heavy rail—"were considered, but eliminated" from further study early in the screening process.  AR1_001307, FEIS.   The FEIS describes commuter rail as best suited for longer distances from suburban and rural communities to more densely populated employment centers.  *Id.*  As a result, the Agencies determined that commuter rail was not a reasonable alternative because the Corridor did not encompass the distances for which it is best suited. AR1_000004, ROD.

Heavy rail is akin to the Metro rail system in Baltimore (*i.e.*, the subway system). AR1_001305, FEIS.  The FEIS indicated that there was strong public interest in that particular mode of transportation.  AR1_001309, FEIS.  Due to the strong public interest in a heavy rail alternative, the Agencies analyzed the option in detail.   AR1_001309-AR1_001310, FEIS; AR1_006655-AR1_00688, FEIS, Appendix G, Heavy Rail Technical Report.  Nevertheless, the Agencies ultimately concluded that heavy rail is not a reasonable alternative, AR1_000004- AR1_000005, ROD, because of concerns related to technical feasibility and capital costs.

AR1_001309, FEIS.  The FEIS explains that a heavy rail transit system "must be physically separated from its surrounding environment" due to it its power source, an electrified third rail. *Id.*  As a result, construction of a heavy rail system would require substantial tunnel and bridge construction to ensure total separation of the power source from the surrounding environment. *Id.*  The capital costs of such construction are significant as compared to light rail and bus line alternatives. *Id.*

Additional study by the MTA of two heavy rail options confirmed its substantial cost. The first option examined by the MTA was 14.3 miles of heavy rail from the Social Security Administration in Woodlawn, Baltimore County to "Greektown" in east Baltimore City. AR1_001309, FEIS.  The estimated cost was $759 million more than the Preferred Alternative ($3.334 billion compared to $2.575 billion).  *Id.*  The second alternative of heavy rail combined three modes of transportation—heavy rail, light rail, and streetcar.  *Id.* at AR1_001310.  This hybrid model that was analyzed is described in the FEIS as follows, *id.*:

> The heavy rail component extended the existing Metro from Johns Hopkins Hospital to the Bayview Medical Center. From CMS to the western portion of downtown, the Alternative would be light rail similar to the Preferred Alternative. Upon entering downtown, the light rail would be surface to Camden Yards, and then would be located in a tunnel to the existing Charles Center Metro Station. The third component would be a streetcar from Camden Yards to with [sic] surface operations along Pratt Street and through Harbor East, Fell's Point, Canton, Canton Crossing, and Haven Street to the Amtrak right-of-way, ending at Edison Highway. The streetcar alternative would run in mixed traffic along the surface.

This hybrid alternative, incorporating heavy rail, was projected to cost $2.518 billion, a cost comparable to the Preferred Alternative according to the Agencies.  *Id.*  Nonetheless, as explained by the Agencies in the FEIS, the hybrid alternative was not pursued for three reasons, *id.*:

- Many east-west trips through the corridor would require transfers because of the

13

multiple modes, increasing transit travel time and decreasing ridership.

- All of the streetcar components would require sharing lanes with traffic, which degrades both vehicular traffic movements as well as transit travel times, and would reduce ridership.

- Introducing a new mode, streetcar, requires an additional new maintenance facility for streetcars and introduces a new mode of transit to Baltimore, which does not improve transit efficiency.

After the elimination of commuter rail and heavy rail, the four alternatives carried forward by the Agencies for detailed study in the AA/DEIS were: (1) No-Build, (2) Transportation System Management ("TSM"), (3) Bus Rapid Transit ("BRT"), and (4) Light Rail Transit ("LRT").   AR1_000005-AR1_000006, ROD; AR1_009302, AA/DEIS.  The ROD and several reports prepared during the EIS process offer descriptions of each of these four alternatives.

The ROD describes Alternative 1, "No-Build," as "represent[ing] the future conditions of transportation facilities and services if the Red Line is not built."  AR1_000006, ROD.  It adds: "The No-Build Alternative did not meet the purpose and needs [of the Project], but was advanced for detailed study, as required by NEPA. It provides a point of comparison for assessing the benefits and impacts of the other alternatives." *Id.*

With respect to Alternative 2, "TSM," the ROD explains that it would consist of "upgrades to existing transit service" in the Corridor, but would not include construction of a new transit line. AR1_000006, ROD; *see* AR2_100636, Scoping Process Report dated October 2004.  The Agencies concluded: "The TSM Alternative did not meet the purpose and needs [of the Project], but was advanced for detailed study in the AA/DEIS because consideration of a TSM Alternative was required by FTA as part of an Alternatives Analysis under the New Starts funding program."  AR1_000006, ROD.

As to Alternative 3, "BRT," the FEIS characterized it as a "faster and more efficient

version of traditional bus service," in which buses operate on exclusive rights-of-way or on roadways that permit buses to bypass congestion through traffic signal prioritization. AR1_009284, FEIS; *see* AR2_100636, Scoping Process Report dated October 2004. Six "representative combinations of alignments" for BRT were studied by the Agencies in detail in the AA/DEIS, AR1_000006, ROD:

- Alternative 3A – BRT, dedicated surface
- Alternative 3B – BRT, downtown tunnel + dedicated surface
- Alternative 3C – BRT, downtown tunnel + Cooks Lane tunnel[16] + dedicated surface
- Alternative 3D – BRT, maximum tunnel + dedicated surface
- Alternative 3E – BRT, dedicated surface with Johnnycake Road alignment
- Alternative 3F – BRT, shared and dedicated surface + downtown tunnel

Finally, the Scoping Process Report dated October 2004 explains Alternative 4, "LRT," as an "electric railway system," which can operate "single cars or short trains" along fixed tracks on aerial structures and at ground level in mixed traffic or in dedicated traffic lanes. AR2_100636, Scoping Process Report dated October 2004.   According to the FEIS, LRT is powered by overhead lines, as opposed to an electrified third rail, which is necessary for heavy rail transit.   AR1_009284, FEIS.   Four "representative combinations of alignments" for LRT were studied in detail by the Agencies, AR1_000006, ROD:

---

[16] Cooks Lane is a residential street running from Baltimore County to Baltimore City parallel to the southwest end of Gwynns Falls Park.  As described in the FEIS, it has "one travel lane in each direction plus [lanes on either side for street-side] parking."  AR1_001317, FEIS. The MTA was interested in having a Cooks Lane alignment for the Red Line because, in its view, such an alignment would "most directly serve[ ] major activity centers such as the [Social Security Administration], Security Square Mall, and CMS."  *Id.*  However, because Cooks Lane is a residential street, according to the FEIS, "[i]t [was] essential to maintain each of the travel lanes [on Cooks Lane open to retain] access to the adjacent residences," rendering a surface alignment a less attractive option.  *Id.*  The FEIS explains: "[A]ll surface options would have eliminated one on-street parking lane.  More than 100 parking spaces would be eliminated with the loss of one parking lane on Cooks Lane . . . ."  *Id.*  To accommodate these concerns, the proposed alignments in Alternative 3C for BRT and Alternative 4C for LRT provide for a tunnel under Cooks Lane.  AR1_000006, ROD.

15

- Alternative 4A – LRT, dedicated surface
- Alternative 4B – LRT, downtown tunnel + dedicated surface
- Alternative 4C – LRT, downtown tunnel + Cooks Lane tunnel + dedicated surface
- Alternative 4D – LRT, maximum tunnel + dedicated surface

The detailed evaluation of these twelve variations of the four alternatives culminated in the issuance of the AA/DEIS in September 2008.   AR1_009243-009525, AA/DEIS.   "The AA/DEIS provided information about the trade-offs among the alternatives, but did not identify a preferred alternative."   AR1_001311, FEIS.   From October 3, 2008, to January 5, 2009, the AA/DEIS was "circulated for public and agency comment . . . ."   AR1_000002, ROD; *see* AR1_001871, FEIS.   More than 500 citizens attended four public hearings held at various locations in the Corridor.   AR1_000016, ROD.   During this process, the Agencies received 729 comments on the AA/DEIS from individuals and organizations, including six petitions and recorded testimony.   AR1_001312, FEIS.[17]   According to the ROD, "[t]he majority of the comments stated either support for Alternative 4C [, a variation of LRT,] or concerns about surface transit on Edmondson Avenue and Boston Street."   *Id.*

With support found in the Administrative Record, the MTA summarizes its public outreach following the issuance of the AA/DEIS, ECF 44-2 at 6, MTA Memo. (internal citations to the Administrative Record omitted):

> Station Area Advisory Committees ("SAAC"),[18] local citizens representing each of the 19 station areas [for the LRT alternative], were established, as well as additional outreach efforts led by MTA Community Liaisons.   The MTA Community Liaisons utilized 36 locations within the Project area as resource hubs.   They enhanced awareness of the Project through radio, print, a project

[17] Some 650 of the 729 comments received with respect to the AA/DEIS were generated during the public hearings.   AR1_000016, ROD.

[18] "The SAACs are an interactive community-based design initiative formed to fulfill a commitment for community-centered station design, development, and stewardship . . . ."   AR1_000002, ROD.

website, social media, a speaker's bureau and attendance at local event. Outreach was also available in both English and Spanish. The Citizens' Advisory Council, a council created by the Maryland General Assembly, also provided input on the potential impacts and alternatives.

Several agencies submitted comments concerning the AA/DEIS. They included the United States Environmental Protection Agency, the Maryland Department of Planning, the Baltimore City Health Department, and the Baltimore City Department of Transportation. AR1_001884, FEIS.

The FTA's New Starts program requires the local project sponsor to identify the Locally Preferred Alternative ("LPA"), as part of the application for funding. AR1_000006, ROD. In August 2009, after review of the public and agency comments concerning the AA/DEIS, the Governor of Maryland, ECF 44-2 at 6, MTA Memo., with agreement from Baltimore City and Baltimore County, announced the LPA. *Id.* at AR1_000002.

The LPA is "an approximately 14-mile LRT alignment from CMS in Baltimore County to Johns Hopkins Bayview Medical Center campus in Baltimore City, with tunnel alignments under Cooks Lane and through downtown from Martin Luther King, Jr. (MLK Jr.) Boulevard to Boston Street." *Id.* at AR1_000002. The LPA is a modification of Alternative 4C in the AA/DEIS—an LRT alternative with "downtown tunnel + Cooks Lane tunnel + dedicated surface" set forth in the AA/DEIS. *Id.* at AR1_000006. But, it "included several design refinements to address public comments, optimize cost effectiveness, and meet engineering and transit operation requirements." *Id.* at AR1_000007.

Ultimately, LRT was selected as the LPA over BRT for several reasons set forth in detail in the FEIS. AR1_001312, AR1_001316, FEIS. According to the Agencies, some of the advantages of LRT over BRT include greater projected ridership, faster travel times, stronger public support for LRT, cost-effectiveness under the New Starts criteria, and greater potential to

17

attract new transit riders.  AR1_001312, AR1_0011316, FEIS.

The FTA asserts, ECF 45-1 at 12, FTA Memo. (internal citations to the Administrative Record omitted):

> The [LPA] highlighted two important choices made by the MTA.  First, the Agency selected light rail transit as the preferred mode for the Project.  Second, the Agency selected an alignment that included surface transit for most of the Project, except for tunnels under Cooks Lane and in a segment of the Project located in downtown Baltimore.

After the announcement of the LPA, the MTA performed further research and solicited additional public comment to refine its analysis of the alternatives.  ROD, AR1_000002.  As the ROD explains, *id.*:

> [T]he MTA conducted additional technical studies, continued public involvement and agency coordination activities, including the Station Area Advisory Committees. . . . Seventeen SAACs were formed in Fall 2010[19] and began providing input into the planning and design of the 19 proposed light rail stations. In the Spring of 2011, four public meetings were held to highlight the work of the SAACs and receive additional public input.
>
> MTA again held public meetings in the summer of 2012 to present the latest information on the project, including refinements to the LPA.  In accordance with 23 CFR 771.129(a), the MTA prepared a reevaluation because more than 3 years had passed since publication of the AA/DEIS.  The reevaluation compared the Preferred Alternative to the build alternatives considered in the AA/DEIS.  On September 17, 2012, FTA concluded that there are no new significant environmental impacts beyond those evaluated in the AA/DEIS.

The results of the technical studies, public input on the LPA, and the definition of the Preferred Alternative were presented in the FEIS.[20]  *Id.*

### D.  FEIS

On December 4, 2012, the FTA and the MTA issued the Final Environmental Impact

---

[19] In the MTA Memo., the MTA indicated that the SAAC's were established in the "Fall of 2008."  ECF 44-2 at 6, MTA Memo.  This discrepancy is not material.

[20] As discussed, *infra*, the Preferred Alternative is considered by the Agencies to be a product of refining the LPA.  AR1_001303, FEIS.

Statement and Draft Section 4(f) Evaluation.[21]   The FEIS is a massive report.  In its entirety, it

exceeds eight thousand pages.  *See* FEIS Volume 1, AR1_001231-AR1_001868; FEIS Volume 1

Appendices, AR1_001869-AR1_008938; FEIS Volume 2, AR1_008939-AR1_009112; Draft

Section 4(f), AR1_009113-AR1_9242.  Volume 1 of the FEIS is over six hundred pages and it

presents analyses of the No Build Alternative and the Preferred Alternative.  It has nine chapters,

including those on the purpose and needs of the Project, public participation and agency

outreach, and the evaluation of Project alternatives, to name a few.   It also has over six thousand

pages in appendices and technical reports, including analyses of environmental justice, natural

resource maps, forest and hedgerows datasheets, a tree inventory list, and photo documentation

of water and wetlands in the Corridor.  Volume 2 of the FEIS is over one hundred pages and

presents a series of transportation and environmental maps of the Corridor and the Preferred

Alternative.  It also includes sections on the Corridor's historic properties, air quality, and storm

water management.

　　　As noted, the FEIS carried forward two options for further study: the Preferred

Alternative and the No-Build Alternative.  FEIS, AR1_001326.   The No-Build Alternative is the

"foundation for comparing all of the other alternatives."  AR2_1006386, Scoping Process Report

---

[21] Federally funded highway projects must comply with both federal environmental
protection laws, such as NEPA, and historic preservation laws, such as Section 4(f) of the
Department of Transportation Act of 1966, 49 U.S.C. § 303(c).

　　　In particular, Section 4(f) permits a federal project "requiring the use of publicly owned
land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local
significance, or land of an historic site" to be approved only if "(1) there is no prudent and
feasible alternative to using that land; and (2) the program or project includes all possible
planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic
site resulting from the use."  49 U.S.C. § 303(c).

　　　Plaintiff does not contend that defendants failed to comply with Section 4(f).

dated October 2004.   It "consist[s] of existing and programmed transit and roadway improvements." *Id.*   The Preferred Alternative is characterized by the Agencies as the product of several refinements to the LPA.  AR1_001303, FEIS.  It is described in further detail in the FEIS, as follows, *id.* at AR1_001329:

> [A] 14.1-mile light rail transit line that would operate from the CMS in Baltimore County to the Johns Hopkins Bayview Medical Center campus in Baltimore City….The transitway includes a combination of surface, tunnel, and aerial segments. The alignment, stations, park-and-ride facilities, system elements, tunnel ventilation, light rail vehicles, operations and maintenance facility, and rail and bus operations plans are described in this section.

The MTA explains, ECF 44-2 at 11, Motion:

> The Red Line will run on surface, below-ground and above-ground tracks, utilizing the single light rail transit mode, with 19 stations, three new park-and-ride lots, and ventilation buildings and equipment for the underground portions of the line.  AR1_000008, ROD at 8.  There will be two tunnels – one at Cooks Lane and one in the Downtown Baltimore area.  The Project includes one operations and maintenance facility capable of storing up to 38 light rail vehicles.  Power will be supplied by a traction power system including overhead catenary power lines.  AR1_000007-000008, ROD at 7-8.

Of the Preferred Alternative's nineteen stations, fourteen would be surface stations and five would be underground.  AR1_001333, FEIS.

The Agencies' projected cost of Preferred Alternative, "based on the construction schedule, escalation, and inflation while the Red Line is being constructed," is $2.223 billion "in 2012 dollars."  AR1_001360, FEIS.  "The cost estimate at the start of Red Line service in 2021 is $2.575 billion in year of expenditure dollars."  *Id.*[22]   The FEIS estimated that in 2035, on a daily basis, the Red Line will receive approximately 55,0000 "individual boardings and alightings (passengers getting on and off a light rail vehicle, respectively) . . . ." ARI_001267,

---

[22] On a chart on the same page of the FEIS as the $2.575 billion cost estimate, the projected cost of the Preferred Alternative is also listed as $2.574 billion.  AR1_001360, FEIS. For the purposes of this Opinion, this discrepancy is not material.

FEIS.

In the FEIS, the Agencies presented analyses as to the Project's potential impacts on affected environmental resources.  They used a variety of scientific methodologies to evaluate various aspects of the Project, including air quality and natural resources.  AR_006124-008864, FEIS, Technical Reports.

The FEIS Notice of Availability was published in the Federal Register on December 14, 2012, initiating a 45-day period for public comment.  77 Fed. Reg. 74479.  During this period, the Agencies received 243 written comments concerning the FEIS.  AR1_000017, ROD.  Many of the comments were submitted from individuals, organizations, and businesses in the Canton area of Baltimore City, part of the Corridor.  *Id.*  As discussed, *infra*, the ROD provided a summary of the primary concerns raised by these comments.

### *E.  ROD*

On February 28, 2013, the FTA issued the final phase of the EIS, its ROD, AR1_000001-000023, plus attachments.  *See* AR1_000024-001230.  The ROD approved the Preferred Alternative set forth in the FEIS as in compliance with "relevant environmental requirements." AR1_000001, ROD.  In particular, the FTA stated that, pursuant to NEPA, the FTA had determined that "the requirements of the National Environmental Policy Act of 1969 (NEPA) have been satisfied for the Red Line project."  *Id.*

With respect to comments received on the FEIS, the ROD offered this summary, AR1_000017, ROD:

> The majority of comments received were from individuals, organizations or businesses located in or representing the Canton area. Very few comments were specific to other areas along the corridor. Most of the comments received were related to effects to the Canton area, specifically along Boston Street. The main concerns raised regarding Boston Street and the Canton area included parking, traffic, access, business and economic hardship, community cohesion, and

flooding. Many comments expressed disapproval of a surface alignment on Boston Street, while others questioned the validity of the ridership estimates. The comments received included many common themes or concerns raised repeatedly.

The ROD identified common themes and provided responses to these common themes in an attachment to the ROD. AR1_000119-AR1_000120, ROD. To illustrate, in response to several comments concerning the effects upon businesses located on Boston Street during the construction of the Project, the ROD provided this explanation, AR1_000121-AR1_000122, ROD (italics in ROD):

> *Section 4.3 of the FEIS acknowledges the loss of parking on Boston Street. While the proposed design minimizes parking* impacts *as much as possible, the implementation of the Red Line would require the elimination of parking spaces along the corridor. Currently, there are 239 total parking spaces (161 full-time and 78 part-time) along Boston Street from S. Montford Avenue/Hudson Street to Haven Street. Under the Preferred Alternative 126 parking spaces (both on-street and off-street) would be displaced. For those parking spaces that remain along Boston Street, vehicles may be parked 24-hours a day. The proposed park-and-ride at the Brewer's Hill/Canton Crossing Station could provide temporary parking spaces during construction. As noted in Section 4.3 of the FEIS, the parking lot is being designed to accommodate 600 spaces. Additionally, Baltimore City Department of Transportation is working as part of a separate effort with the Canton community to identify opportunities to improve parking throughout the neighborhoods. As stated in Section 4.7.3 of the FEIS, MTA will work with the contractor to develop a plan to minimize the temporary loss of parking during construction.*
>
> *As stated in Section 5.6 of the FEIS, MTA will continue to coordinate with businesses throughout the corridor, especially those adjacent to the Preferred Alternative alignment, to avoid or minimize temporary disruptions to* parking, *access, or delivery. In addition to minimizing the loss of parking, MTA will work with businesses along Boston Street to minimize and mitigate impacts to businesses. MTA will assist businesses in communicating to their customers before and during construction. MTA will provide construction updates to businesses, and inform business customers and the community about construction.*

With respect to the remaining comments, the ROD explained that a "matrix" was created which includes all the FEIS comments and the Agencies' responses thereto. AR1_000017, ROD. According to the ROD, the matrix "identifies the commenter name or affiliation, the

issues raised by each commenter, and an associated comment code. Each comment included in the table has been categorized based on the main point of the comment.  A total of 45 different comment categories have been identified." *Id.*[23]  The ROD also explained, *id.* at AR1_000116.

> All comments received during the formal comment period are being evaluated by MTA and FTA and have resulted in additional commitments, outreach, or potential mitigation. The numerous comments received throughout the NEPA process have been considered; however, not all comments can result in changes to the project as recommended by every commenter.

Notwithstanding comments as to the FEIS, the ROD approved the Preferred Alternative as proposed in the FEIS.  AR1_000001, ROD.

### F. Plaintiff's Involvement

Mr. Cutonilli has been a very active participant in various phases of the EIS process.[24] His involvement reflects, in general, the intense public interest as to the Red Line Project and also demonstrates the public's ability to participate in planning and development.

---

[23] Due to its size, the matrix is only in electronic format.

[24] Although not an exhaustive list, some of Mr. Cutonilli's comments on the Project submitted to the Agencies and the Agencies' responses to his comments can be found in the Administrative Record, as follows: AR1_000889-000895, written FEIS comment from Mr. Cutonilli dated January 28, 2013; AR1_002388-002390, oral comment of Mr. Cutonilli on the DEIS at Public Hearing dated November 6, 2008; AR3_000001-000004, email correspondence between Henry Kay, MTA Executive Director for Transit Development and Delivery, and Mr. Cutonilli, dated May 24, 2013 and March 15, 2013; AR2_000027, letter from Brigid Hynes-Cherin, FTA Regional Administrator, to Mr. Cutonilli, date stamped April 30, 2013; AR2_000047-000049, letter from Mr. Cutonilli to Brigid Hynes-Cherin, dated March 13, 2013; AR2_052060, letter from Lorenzo Bryant, MTA Office of Planning, Project Manager, to Mr. Cutonilli dated July 29, 2010; AR2_052061-052062, email correspondence between Lorenzo Bryant, Project Manager, MTA Office of Planning, and Mr. Cutonilli, dated April 26, 2010, and July 29, 2010; AR2_052759, letter from Harold Bartlett, Deputy Secretary, Maryland Department of Transportation, to Mr. Cutonilli dated June 25, 2010; AR2_053126, undated letter from Mr. Cutonilli to Beverly Swaim-Staley, Secretary, Maryland Department of Transportation; AR2_056156, undated letter from Mr. Cutonilli to Beverly Swaim-Staley; AR2_061957-061958, letter from Diane Ratcliff, MTA Director of Planning to Mr. Cutonilli, dated January 7, 2009; AR2_066106-066110, letter dated January 16, 2008, from Lorenzo Bryant, MTA, Red Line Project Manager, to Mr. Cutonilli.

Plaintiff submitted numerous comments concerning the Project to the Agencies, and received several responses from the Agencies.   In addition to comments submitted to the MTA and the FTA, *see* note 24, Mr. Cutonilli also communicated with other agencies that were involved, in some way, with the Red Line Project.  *See, e.g.*, AR2_054359-054364, Letter from Regina Aris, Acting Director, Baltimore Metropolitan Council, Transportation Planning Division, to Mr. Cutonilli dated November 18, 2009.

On October 26, 2004,[25] plaintiff attended a Public Open House.[26]   ECF 47-1 at 28, Opposition; AR2_100435, Public Open House Sign-In Sheet dated October 26, 2004 ("Open House Sign-In Sheet").   There, the plaintiff learned that the Agencies were considering several options, including various forms of BRT as a preferred plan for the Project.   ECF 47-1 at 28, Opposition.   Based on plaintiff's "limited knowledge of transit at the time and the limited information provided by the defendants," plaintiff was satisfied that "the defendants were looking at appropriate alternatives."  *Id.*

Cutonilli attended another Public Open House on November 13, 2007.  *Id.*  He contends that at this meeting he became aware of other alternatives that were not being evaluated in detail, including heavy rail transit.  *Id.*  Therefore, plaintiff joined "certain transit advocacy groups."  *Id.*  He began to attend the Red Line Citizen's Advisory Council ("CAC") meetings to learn more about the process.   CAC Member Attendance Sheet dated December 13, 2007, AR2_074760; ECF 47-1 at 28, Opposition.   At these meetings, the Agencies presented more detailed

---

[25] As noted, as part of the public outreach for the Project, the Agencies held a series of Public Open Houses in the Corridor in order to introduce the Project to the community and promote community-wide exchange of information.  AR1_009390, AA/DEIS.

[26] In plaintiff's Opposition, he stated that the date of the Public Open House was held on October 28, 2004, ECF 47-1 at 28.  However, the sign-in sheet submitted in the Administrative Record is dated October 26, 2004.  *See* AR2_100435, Open House Sign-In Sheet.  This discrepancy is not material.

information about their progress on the Project.   ECF 47-1 at 28, Opposition.   Members of the

public also spoke to the Agencies about issues regarding the various alternatives under

consideration.   *Id.*

On November 6, 2008, Mr. Cutonilli testified at a public hearing about the DEIS.

AR1_002388-002389, Public Hearing Testimony of Mr. Cutonilli on the DEIS dated November

6, 2008 ("Oral DEIS Comment").[27]   That same day, he submitted a similar, but more detailed,

written comment about the DEIS to the Agencies.   AR2_066106-066110, Written Comment on

the DEIS submitted by Mr. Cutonilli on November 6, 2008 ("Written DEIS Comment").[28]   In

both the Oral DEIS Comment and the Written DEIS Comment, Mr. Cutonilli proposed a hybrid

alternative for the Project that would "use a combination of strategies," heavy rail and bus rapid

transit.   AR2_066106, Written DEIS Comment; *see* AR1_002388, Oral DEIS Comment.

As set forth in plaintiff's detailed Written DEIS Comment, Cutonilli's BRT segment

would use "existing infrastructure in the [MARC] Penn Line,[29] 'highway to nowhere' median

and the metro subway," as well as existing highways at the western end of the Corridor with a

new "highway tunnel under Cooks Lane."   AR2_066106, Written DEIS Comment. The tunnel

would "consist of a three lane highway in a double-decker configuration."   *Id.*   For the heavy rail

portion, Mr. Cutonilli proposed "utiliz[ing] the existing Metro subway infrastructure downtown

to the end of the line.   It would then extend the Metro subway line to the existing Penn Line

---

[27]   Mr. Cutonilli's Oral DEIS Comment and the Agencies' response to it were both
included in the FEIS.   AR1_002388-002389, FEIS.

[28] The Written DEIS Comment is included multiple times in the Administrative Record.
*See* AR2_066106-AR2_066110; AR2_066111-AR2_066113; AR2_066123-AR2_066127.

[29] MARC's Penn Line runs between Union Station in Washington D.C. and Perryville,
Maryland.   *See* MARC   Penn   Line   Schedule   effective   August   5,   2013,
https://mta.maryland.gov/sites/default/files/PennLine_Aug2013_grid_0.pdf.

infrastructure to the abandoned Norfolk-Southern right of way.  It would continue on the surface along this abandoned right of way to Canton Crossing." *Id.*  He also proposed for the heavy rail segment the use of a "dual mode electrified rail car utilizing the over catenary of the Penn Line and the third rail of existing Metro subway.*"  Id.* at AR2_066107.  Mr. Cutonilli indicated that the type of rail cars capable of running on this configuration of heavy rail "run on the Metro North New Haven Line in the NYC area." *Id.*

To formulate cost projections for his alternative, Mr. Cutonilli used "gross estimates of costs obtained from the DEIS." *Id.* According to Mr. Cutonilli, the total cost for his alternative would be approximately $1.135 billion. *Id.*  Mr. Cutonilli assured the Agencies in his Written DEIS Comment that his alternative "will probably meet the FTA cost effectiveness guidelines if additional analysis is conducted." *Id.*

The MTA and the FTA responded to plaintiff's proposal and their response is included in the FEIS, issued on December 4, 2012.  AR1_002388-002390, FEIS ("Agencies' Response").  In the Agencies' Response, they indicated that Mr. Cutonilli's proposal was "infeasible from a capital cost standpoint" because the "BRT portion of [Mr. Cutonilli's] alternative would require a very expensive, 45-foot diameter tunnel under Cooks Lane and would also require all passengers to transfer from BRT to heavy rail, increasing transit travel times and decreasing ridership." *Id.* at AR1_002388.[30]

The Agencies also noted that much of the proposed heavy rail portion of Mr. Cutonilli's alternative was considered as part of the heavy rail alternative analyzed for both the DEIS and in the heavy rail technical analysis.  *Id.*  They also explained that the other parts of Mr. Cutonilli's alternative were considered and determined not to meet the purpose and needs for the Project.

---

[30] *See* note 16, *supra*, describing Cooks Lane.

*Id.*  In particular, among other things, the Agencies challenged the proposed alternative as cost prohibitive and expressed concern about the need for travelers to transfer, given the dual modes of transportation.  *Id.*  at AR1_002388-AR1_2390.

In addition to the formal response to plaintiff's comment published in the FEIS, the MTA wrote to Mr. Cutonilli personally.  In a letter from Diane Ratcliff, MTA Director of Planning, dated January 7, 2009, she explained to Mr. Cutonilli, AR2_061957-061958:

> [T]here are numerous engineering and operational limitations, including along the Penn Line right-of-way where expansion is proposed to provide for additional commuter capacity.  Any tunnel under Cooks Lane that is twice as large as that proposed by the LPA would exacerbate the technical and environmental challenges the Red Line is undoubtedly already faced with as it moves through the preliminary engineering phase.

The MTA also pointed out to plaintiff that it did "not see any beneficial financial implications with this idea."  *Id.* at AR2_061958.  Further, the letter stated that Mr. Cutonilli's cost projections for his proposed alternative were "based on estimates, some from early Red Line analyses that has [sic] since been enhanced, and do not reflect an alternative that would be better than the selected LPA."  *Id*.

As noted, the FEIS was issued years later, on December 4, 2012.  It announced the Agencies' Preferred Alternative.  In response, Mr. Cutonilli submitted to the Agencies a written comment on the FEIS dated January 28, 2013.  AR1_000889-000895 ("FEIS Comment).  In the FEIS Comment, Mr. Cutonilli complained that his proposed alternative was not evaluated adequately.  *Id.* at AR1_000889.  He asserted that although his alternative shared certain characteristics with other alternatives studied in detail by the Agencies, it warranted individual consideration because "it differs in more ways than it is similar."  *Id.*

Further, Mr. Cutonilli claimed that although heavy rail was eliminated as a viable alternative for the Project, due to its capital costs, it should be reconsidered because capital could

be obtained from "highway funds." *Id.*  Mr. Cutonilli explained, *id.*:

> In the DEIS, one of the reasons listed for rejecting heavy rail was a limit on the amount of federal funding for the project (pg 29) "Even if the project received federal funds, historically most projects have been capped at $500 million in appropriations to optimize the number of eligible projects funded. Given this restriction, the State of Maryland would not be able to afford the $1.7 billion to $2.1 billion local share."  The heavy rail alternative was projected to cost between $2.2 billion and $2.6 billion, the same range as the current LPA. According to this reasoning, Maryland cannot afford its share of the LPA project.

> This alternative shifts a large percentage of the project towards highway funds, which have historically had a much larger percentage of funds. The Maryland highway trust fund gets somewhere between 1/2 to 3/4 of its money from highway derived revenue. Highway spending and transit spending is typically an 80/20 split. I have been told many state legislators are reluctant to vote for transit projects and a project that includes a highway portion would allow them to vote for it because of the highway. According to a recent legislative analysis report Maryland has very few options of raising revenue for a transit project. One of the few ways it has is to raise gas taxes, which demonstrates why it is appropriate to include a highway project. Having a highway project also allow [sic] other alternative financing options such a public private partnership (P3), which is not available to a transit only project according to the legislative report. The problem is not just cost, but where and how you obtain funding. Sometimes it's better to have higher costs if those higher costs allow the use of more funds.

In addition, plaintiff provided further details about his proposal, *id.* at AR1_000892:

> It is expected that this alternative would use a dual mode third rail and overhead catenary system to take advantage of the third rail the existing metro uses and utilize existing catenary on the Amtrak Northeast Corridor/MARC Penn Line. These systems can be found in use on the MTA New Haven Line in New York City with their M2, M4, M6 and M8 rail cars. This capability can be given to existing Metro rail cars through the use of catenary powered engines at each end similar in to the Acela train that utilize this corridor.

Mr. Cutonilli also suggested that his proposal is capable of several variations that could

"optimize" outcomes.  *Id.*  In explaining the malleability of his proposal, he asserted, *id.*:

> The original DEIS comments presented only two, a Cooks Lane tunnel and surface BRT or full tunnel under Cooks lane through to West Baltimore MARC. The number of lanes could be reduced, the BRT lane could be placed on the surface with an underground highway. The existing Edmondson Ave bridge could be utilized instead of tunneling. The project could be divided into at least three projects, extension of the metro, the BRT lines and the connection into the metro from the west. The project could be extended to include the ridership outside the

existing corridor. It is expected that ridership will increase much more rapidly because most of the infrastructure is already in place or is already part of this project.

Another variation that could occur is to route the heavy rail alternative through Johns Hopkins Bayview in a similar manner to the existing LPA. This was not done for cost and ridership reasons. It was felt that a short bus transfer would be more appropriate given the size of the campus and the potential for temporary disabilities common among patients needing medical treatment.

The variations listed are to illustrate the potential for this alternative to be modified. This list is not exhaustive and should not be taken as encompassing all possible variations.

In response, Henry Kay, MTA Executive Director for Transit Development and Delivery, sent Mr. Cutonilli an email on May 24, 2013. AR2_000001-000004 ("MTA Emails of May 24, 2013"). Mr. Kay identified several issues with respect to Mr. Cutonilli's proposal, including its cost, the extent to which it would require riders to transfer in light of the two modes of transportation, and the operational challenges. AR2_000001-000004. Regarding the operational challenges, Mr. Kay wrote, AR3_000002 (internal citation omitted):

The approved Cooks Lane tunnel [for the Preferred Alternative] is comprised of two 22-foot diameter tunnels which is the absolute minimum required to accommodate typical light rail vehicles. A tunnel that would accommodate buses and cars would require two lanes in each direction and shoulders to provide a safe pull-off area. A similar tunnel is under construction in Seattle and, with a finished diameter of 54-feet, is the largest tunnel ever constructed. A tunnel of this size under Cooks Lane would produce a massive amount of excavated material which would be costly to truck away from the site to dispose. Extending the tunnel under Edmonson Avenue to West Baltimore would add more than a billion dollars of cost to the project.

Nonetheless, plaintiff insists that none of the responses he received from the Agencies adequately addressed his proposal and, in particular, his suggestion as to the use of highway funds or particular railway cars. ECF 47-1 at 8, Opposition. Plaintiff alleges: "[T]he defendants appear to have rejected the plaintiffs [sic] proposal based on other proposals that were more dissimilar than they were similar. They have also lost comments and have provided

unsubstantiated responses." Complaint ¶ 29, ECF 1. In plaintiff's view, "[t]hese responses

violated 40 C.F.R. 1503.4." *Id.* In this respect, according to plaintiff, "[t]he Defendants failed to

insure the professional integrity, including scientific integrity, of the discussions and analyses in

[the] environmental and impact statements (40 C.F.R. 1502.24). This prevented the defendants

from rigorously exploring and objectively evaluating all reasonable alternatives including

reasonable alternatives not within the jurisdiction of the lead agency. (40 C.F.R. 1502.14)." *Id.*

Plaintiff contends that he "tried on numerous occasions to raise issues with the process and

determine if sufficient technical basis could be substantiated. Issues with the public participation

process (40 C.F.R. 1506.6) contributed to the failure." *Id.*

In defendants' Motions, they argue that they have complied with the requirements of

NEPA and the applicable federal regulations, and have adequately evaluated and responded to

plaintiff's comments in connection with the Red Line Project.

Additional facts are included in the Discussion.

## II.       DISCUSSION

### A. *Standard of Review under NEPA*

Claims brought under NEPA do not provide a private cause of action. *Lujan v. Nat'l*

*Wildlife Fed.*, 497 U.S. 871, 882 (1990). Rather, the Administrative Procedure Act ("APA," 5

U.S.C. § 701 *et seq.*) provides for judicial review of a final agency action. *See Friends of Back*

*Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 586 (4th Cir. 2012); *Lee v. U.S. Citizenship &*

*Immigration Servs.*, 592 F.3d 612, 619 (4th Cir. 2010); *Ohio Valley Envtl. Coal v. Aracoma Coal*

*Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Notably, "claims brought under the APA are adjudicated

without a trial or discovery, on the basis of an existing administrative record . . . ." *Audubon*

*Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660

(D. Md. 2007) (citing *Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd*, 1992 WL 180138, (4th Cir. July 29, 1992)).   Thus, "such claims are properly decided on summary judgment." *Audubon*, 524 F. Supp. 2d at 660 (citation omitted); *see* 10B Wright and Miller, Federal Practice and Procedure § 2733 (3d ed. 2007).   In this context, "review of the administrative record is primarily a legal question . . . ." *Skinner*, *supra*, 802 F. Supp. at 1332.

"The APA provides that a reviewing court is bound to 'hold unlawful and set aside agency action' for certain specified reasons, including whenever the challenged act is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Friends of Back Bay*, 681 F.3d at 586–87 (quoting 5 U.S.C. § 706(2)(A)); *see United States v. Bean*, 537 U.S. 71, 77 (2002); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012) (quoting 5 U.S.C. § 706(2)). Review under the APA is highly deferential, however, and the agency action enjoys a presumption of validity and regularity.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *Ohio Valley Envtl Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993)).  The party challenging an agency decision has the burden to demonstrate that the agency action was arbitrary or capricious. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995).

Notably, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency . . . ." *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   In assessing an agency decision, "the reviewing court 'must consider whether the decision was

based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Volpe*, 401 U.S. at 416).  "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes 'a rational connection between the facts found and the choice made.'" *Ohio Valley Envtl. Coal*, 556 F.3d at 192 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *see Trinity Am. Corp. v. U.S. EPA*, 150 F.3d 389, 395 (4th Cir. 1998); *Clevepak Corp. v. U.S. EPA*, 708 F.2d 137, 141 (4th Cir. 1983).  However, "[t]he 'arbitrary and capricious' standard is not meant to reduce judicial review to a 'rubber-stamp' of agency action." *Ohio Valley Envtl. Coal*, 556 F.3d at 192 (quoting *Ethyl Corp. v. Envtl. Prot. Agency*, 541 F.2d 1, 34 (D.C. Cir. 1976).

This case involves highly technical issues.  Significantly, a court does "not sit as a scientific body, meticulously reviewing all data under a laboratory microscope," and it does not "undertake comparative evaluations of conflicting scientific evidence." *Manufactured. Hous. Inst. v. EPA*, 467 F.3d 391, 399 (4th Cir. 2006) (internal quotations omitted).  As noted, the question is whether the agency followed the proper procedures and provided a rational basis for its decision.

Moreover, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142.  "[C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

As to the court's role in a challenge pursuant to NEPA, the Fourth Circuit decision in *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411 (4th Cir. 2012), is instructive.  There, the Court

said, *id*. at 421 (alterations in *Webster*):

> In reviewing an agency's efforts to comply with the NEPA, our task is to ensure that it took a "hard look" at the environmental consequences of the proposed action. *Nat'l Audubon Soc'y*, 422 F.3d at 185. This review "requires a pragmatic judgment whether the [EIS's] form, content [,] and preparation foster both informed decision-making and informed public participation." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1036 (9th Cir. 2012) (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010)) (internal quotation marks omitted). A hard look involves, at minimum, "a thorough investigation into the environmental impacts of [the] action and a candid acknowledgement of the risks that those impacts entail." *Nat'l Audubon Soc'y*, 422 F.3d at 185. In conducting this review, we "may not 'flyspeck' [the] agency's environmental analysis, looking for any deficiency, no matter how minor." *Id.* at 186.

### B.  *Fed. R. Civ. P. 56*

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986). As discussed, *infra*, the parties disagree as to whether summary judgment is appropriate here.

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts' showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. In resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion,* 720 F.3d 169, 173 (4th Cir. 2013). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, —— F.3d ——, No. 13–2212, 2015 WL 1062673, at *4 (4th Cir. Mar. 12, 2015); *Mercantile Peninsula Bank v. French,*

499 F.3d 345, 352 (4th Cir. 2007); *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g., Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. Sept. 11, 2014) (per curiam).

### C.  NEPA and the Regulatory Scheme

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370(e), "establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage" and to protect "'natural resources important to' the United States." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321); *see Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 443 (4th Cir. 1996) ("NEPA declares a national policy of protecting and promoting environmental quality.") (citing 42 U.S.C. §§ 4321, 4331(a); *Robertson v. Methow Valley Citizens Council*, *supra*, 490 U.S. at 348). It is intended to foster better decision-making and informed public participation for actions that affect both people and the natural environment. *See* 42 U.S.C. § 4321; 40 C.F.R. § 1500.1(c).

As the Court observed in *Webster*, *supra*, 685 F.3d at 417, "'NEPA is a procedural statute' that 'sets forth a regulatory scheme for major federal actions that may significantly affect the natural environment.'" (Quoting *Audubon*, *supra*, 422 F.3d at 184). Projects that are financed or assisted, in whole or in part, by a federal agency must comply with NEPA and follow the procedures established by the CEQ. *Defenders of Wildlife v. No. Car. Dep't of Transportation*, *supra*, 762 F.3d at 393 (citing 40 C.F.R. § 1508.18); *Webster*, 685 F.3d at 417.

To that end, NEPA and the regulatory scheme establish procedures by which federal agencies must assess environmental impact prior to undertaking any "proposed action," "proposal," or "project," so as to ensure the environmental consequences of a proposed course of action are evaluated adequately. *Robertson*, *supra*, 490 U.S. at 350. The process ensures that "the public has access to the relevant information about the proposed action so that it can participate in the decisionmaking process." *Webster*, 685 F.3d at 617; *see Hodges v. Abraham*, 300 F.3d 432, 438 (4th Cir. 2002).

Once "the adverse environmental effects of the proposed action are adequately identified and evaluated," a federal agency is entitled to "decid[e] that other values outweigh the environmental costs." *Id.* Notably, although "environmental quality [is] a substantive goal" under NEPA, *Glickman*, 81 F.3d at 443, NEPA "does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350; *see Glickman*, 81 F.3d at 443. Thus, NEPA "merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351. In this way, "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ctr. for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citation and quotations omitted).

As stated, there are four phases of the procedural process: a Notice of Intent; a draft EIS; a final EIS; and a ROD. 40 C.F.R. §§ 1501-1502.

"Under NEPA, for every 'major Federal action[ ] significantly affecting the quality of the human environment,' the agency involved must prepare 'a detailed statement' that discloses and evaluates, among other things, 'the environmental impact of the proposed action,' unavoidable

adverse effects of the proposed action, and 'alternatives to the proposed action.'" *Defenders of Wildlife*, 762 F.3d at 393-94 (quoting 42 U.S.C. § 4332(2)(C)) (alterations in *Defenders of Wildlife*); *see Glickman*, 81 F.3d at 443.   This detailed statement—referred to as an environmental impact statement or EIS—must "'provide full and fair discussion of significant environmental impacts' arising from the reasonable alternatives." *Defenders of Wildlife*, 762 F.3d at 394 (quoting 40 C.F.R. § 1502.1).

As indicated, the purpose of public issuance of an environmental impact statement is to "'provid[e] a springboard for public comment' in the agency decisionmaking process itself . . . ." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. at 768 (citation omitted) (alteration in *Public Citizen*). The preparation of an EIS "serves the national policy of protecting and promoting environmental quality" because "it ensures that an agency . . . will carefully consider . . . the project's environmental effects." *Glickman*, 81 F.3d at 443.   In addition, the preparation of an EIS "ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." *Id.* (citing *Robertson*, 490 U.S. at 349).

A federal agency's obligations under NEPA do not terminate with the preparation of an EIS, however.   Even after the FEIS is prepared, NEPA requires agencies "to take a hard look at the environmental consequences of their proposed projects . . . ." *Glickman*, 81 F.3d at 443 (citing *Marsh*, 490 U.S. at 374); *see Webster*, 685 F.3d at 418.   In the event of "'new circumstances or information relevant to environmental concerns'" as to the proposed action, an agency "must prepare a supplemental EIS . . . ." *Glickman*, 81 F.3d at 443 (citations omitted). The Supreme Court has observed: "It would be incongruous with [NEPA's] approach to environmental protection . . . for the blinders to adverse environmental effects, once

unequivocally removed, to be restored prior to completion of agency action simply because the relevant proposal has received initial approval." *Marsh*, *supra*, 490 U.S. at 371. The CEQ regulations mandate that a federal agency prepare a supplemental environmental impact statement if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i)-(ii). The failure to prepare a supplemental EIS requires the reviewing court to "determine whether the agency took a hard look at the proffered new information" and "whether the agency's decision not to prepare a supplemental EIS was arbitrary or capricious." *Glickman*, 81 F.3d at 443 (citations omitted).

With this framework in mind, I turn to the contentions of the parties.

### D. Contentions

#### 1. Alleged Disputes of Fact

As a preliminary matter, in his Opposition plaintiff provides a numbered list of twenty-one matters that he characterizes as "Disputes of Material Facts," which he alleges should preclude summary judgment. ECF 47-1 at 1-5, ¶¶ 1-21, Opposition. To illustrate, plaintiff contends that the list of letters and communications related to the Project included in the Agencies' briefs is not comprehensive. *Id.* at 1 ¶ 2. He also challenges "defendants['] claim that the public involvement process of NEPA were [sic] satisfied…." *id.* at 4 ¶ 18. In addition, he contests "defendants['] claim that they analyzed a reasonable range of alternatives," *id.* at 4 ¶ 20, as well as "defendants['] claims that they [met NEPA's] requirements of scientific integrity . . . ." *Id.* at 4 ¶ 21.

In response to these contentions, the FTA submitted Appendix A to the FTA Reply, which addresses each of plaintiff's alleged disputes of fact point-by-point. ECF 51 at 19-23

¶¶ 1-21.  In sum, the FTA argues that plaintiff's complaints concern immaterial facts or amount to conclusory statements of law. *Id.*

As noted, summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex*, *supra*, 477 U.S. at 322–23.  Despite plaintiff's characterization of these disagreements as "[d]isputes of [m]aterial [f]acts," he admits some of the examples he highlights are merely "improper references" made by defendants.  ECF 47-1 at 1, Opposition.  Such minor discrepancies would not bar summary judgment in this case.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, *supra*, 477 U.S. at 248.  Plaintiff's remaining concerns contemplate the ultimate legal conclusion in this case—whether defendants complied with NEPA—and are thus disputes of law appropriately decided by the court.  For these reasons, plaintiff's argument that issues of fact preclude summary judgment must fail.

### 2.  Consideration of Plaintiff's Alternative

Plaintiff complains that, in preparing the EIS, the Agencies failed to evaluate all reasonable alternatives, as required by 40 C.F.R. 1502.14.  ECF 1 ¶¶ 2, 29, Complaint; ECF 47-1 at 5, Opposition.  In particular, plaintiff challenges the Agencies' decision not to select his proposed alternative for more detailed study.  ECF 47-1 at 5-6, Opposition.

In response, the FTA and the MTA lodge two significant arguments.  First, they contend that plaintiff's proposal did not warrant further study because it was unreasonable.  ECF 44-2 at 18, MTA Memo.; ECF 45-1 at 23-24, FTA Memo.   In the alternative, they posit that further study of Mr. Cutonilli's proposal was not necessary because his alternative was within the spectrum of alternatives that were evaluated in detail.  ECF 44-2 at 16-17, MTA Motion; ECF 45-1 at 18, FTA Memo.

I will address each of these arguments, in turn.  Before doing so, I note that, as a preliminary matter, NEPA does not require that every alternative be subject to detailed consideration.  Rather, an EIS must only "[r]igorously explore and objectively evaluate all *reasonable* alternatives . . . ." 40 C.F.R. § 1502.14(a) (emphasis added). With respect to the choice of alternatives analyzed and the extent to which each option warrants further analysis, the "'rule of reason'" governs.  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (quoting *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 834, 837 (D.C. Cir. 1972)).  In this way, the EIS need not consider every imaginable alternative; rather, only reasonable alternatives are subject to review.  40 C.F.R. § 1502.14(a).

Moreover, and of significance here, when an agency is presented with "a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS."  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981), response to Question 1b[31]; *see also N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) ("Under NEPA, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative.") (quotation omitted).  Alternatives considered reasonable are those capable of accomplishing the project's stated purpose or objective.  *Webster*, *supra*, 685 F.3d at 427; *Audubon*, *supra*, 524 F. Supp. 2d at 667.  Therefore, "[a]n agency need not … discuss alternatives similar to alternatives actually considered, or alternatives which are 'infeasible,

---

[31] In *Associations Working for Aurora's Residential Env't v. Colorado Dep't of Transp.*, 153 F.3d 1122, 1127 n.4 (10th Cir. 1998), the court said: "Although we recognize that we may rely on the interpretive guidance offered by the CEQ, the Forty Questions document is not owed the substantial deference afforded to administrative rules that are the product of notice and comment procedures."  Nonetheless, the document is instructive with respect to how to handle a proposed action under NEPA with a large pool of possible alternatives.

ineffective, or inconsistent with the basic policy objectives'. . . ."  *Kempthorne*, 457 F.3d at 978 (citation omitted).

An agency may begin with a wide spectrum of alternatives that it whittles down over time to a select few options to be explored in detail.  Notably, "NEPA does not impose any minimum number of alternatives that must be evaluated."  *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1212 (11th Cir. 2012) (citation omitted).

### a. Plaintiff's Alternative as Unreasonable

Mr. Cutonilli's proposed hybrid alternative incorporated heavy rail and bus rapid transit. AR2_066106, Written DEIS Comment.  The Agencies argue that plaintiff's proposal did not necessitate detailed consideration because, as proposed, it was not reasonable and did not warrant more in-depth consideration.  ECF 44-2 at 18, MTA Memo; ECF 45-1 at 23-24, FTA Memo.

The MTA and the FTA included a response to plaintiff's proposal in the FEIS, published on December 4, 2012.  AR1_002388-002390, FEIS.  In the Agencies' Response, they indicated that Mr. Cutonilli's proposal was "infeasible from a capital cost standpoint" because the "BRT portion of [Mr. Cutonilli's] alternative would require a very expensive, 45-foot diameter tunnel under Cooks Lane and would also require all passengers to transfer from BRT to heavy rail, increasing transit travel times and decreasing ridership."  *Id.* at AR1_002388.

In addition, the Agencies noted that much of the proposed heavy rail portion of Mr. Cutonilli's alternative was considered as part of the heavy rail alternative analyzed in the AA/DEIS.  *Id.*  They also explained that the other parts of Mr. Cutonilli's alternative were considered and determined not to meet the purpose and needs for the Project.  *Id.*  Among other things, the Agencies determined that the proposed alternative was cost prohibitive, and, given the

dual modes of transportation that the proposal involved, they expressed concern about the need for passengers to transfer from one mode of transportation to another. *Id.* at AR1_002388-AR1_2390.

Also, in the MTA Letter of January 7, 2009, Diane Ratcliff, MTA Director of Planning, explained to Mr. Cutonilli, AR2_061957-061958:

> [T]here are numerous engineering and operational limitations, including along the Penn Line right-of-way where expansion is proposed to provide for additional commuter capacity. Any tunnel under Cooks Lane that is twice as large as that proposed by the LPA would exacerbate the technical and environmental challenges the Red Line is undoubtedly already faced with as it moves through the preliminary engineering phase.

Ms. Ratcliff added that the MTA did not see any "beneficial financial implications" with regard to plaintiff's proposal. *Id.* at AR2_061958. She also noted that Mr. Cutonilli's estimate of costs for his proposed alternative are "based on estimates, some from early Red Line analyses that has [sic] since been enhanced, and do not reflect an alternative that would be better than the selected LPA." *Id.* The Agencies were entitled to make this determination, as it was sufficiently tied to a primary objective that the Project remain cost-effective under the FTA's New Starts criteria. *See* AR1_001308, FEIS. Moreover, the MTA Letter of January 7, 2009, identified legitimate operational limitations as to Mr. Cutonilli's proposal. *See Webster*, 685 F.3d at 427 (holding that the agency properly eliminated alternatives from detailed study for "reasons related to technical feasibility, pecuniary costs, and effectiveness in achieving the purposes of the action").

Among other issues, the ROD addressed the heavy rail alternative. The MTA summarizes, ECF 44-2 at 10-11, MTA Motion:

> The ROD . . . confirms the earlier determination not to consider a heavy rail alternative, finding that the need for total grade separation and the resulting tunnels and aerial structures at all roadway crossings cause such a facility to be

"far more costly to construct than a bus or light rail system." AR1_000004, ROD at 4. The ROD also found that even if a heavy rail alternative had been able to meet FTA's cost effectiveness criteria, "MTA would not have sufficient funding to cover its share of the cost…." AR1_000005, ROD at 5.

The Ninth Circuit's decision in *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517 (9th Cir. 1994) (per curiam), *as amended on denial of reh'g* (Dec. 20, 1994), provides guidance. There, the plaintiffs, four non-profit community organizations, appealed the grant of summary judgment in favor of the U.S. Department of Transportation ("DOT"), the Federal Highway Administration ("FHA"), and San Joaquin Hills Transportation Corridor Agency ("TCA"), defendants, in regard to approval of a tollroad project, a proposed 17.5 mile highway. *Id.* at 521-22. The purpose of the project was "to relieve traffic congestion and high levels of air emissions" in south Orange County, California. *Id.* at 521.

Among other allegations, the plaintiffs contended that the EIS violated NEPA by discussing only three alternatives for the project: the agencies' preferred 17.5 mile highway option with six general use lanes plus two high occupancy lanes; a second "build" alternative with the same lane configuration as the preferred highway option; and the "no-build" alternative. *Id.* at 523-24, 524 n.5. In addition to these three options carried forward for detailed study, the EIS discussed "six categories of alternatives that were evaluated in earlier environmental documents" but were eliminated as viable options earlier in the process. *Id.* at 524.

In their suit, the plaintiffs maintained that the agencies failed to comply with NEPA because "the EIS ignored a smaller, four-lane alternative that included special pricing mechanisms to reduce traffic congestion. . . ." *Id.* at 524. This four-lane alternative was proposed during the EIS comment period by plaintiffs' expert. *Id.* The agencies included their response to the four-lane proposal in the EIS, explaining that "a four lane highway would not meet the project's goal of reducing traffic congestion . . . ." *Id.*

43

In reviewing the agencies' choice not to carry the reduced-lane proposal forward for detailed study, the Ninth Circuit ruled that the plaintiffs' "proposal was properly rejected as not reasonably related to the purposes of the project." *Id.* at 525. The court noted that the basis for the rejection was set forth in the EIS, which was sufficient to comply with NEPA. *Id.* at 524-25. It also noted that the EIS had considered and rejected another "down-sized" highway proposal, and the proposed tollroad incorporated a reduced number of lanes in response to the DEIS, suggesting that further study of the plaintiffs' alternative was not warranted. *Id.* at 525 n.7.

Notably, as to other alternatives, the court said: "[W]hile Laguna points to some alternatives that might have been considered or discussed more fully, the detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable." *Id.* at 525 (citation and internal quotation marks omitted).

The same rationale governs here. As in *Laguana Greenbelt, Inc.*, the record reflects that "the EIS contains a reasonably thorough discussion of alternatives satisfying the goals of the project." *Id.* And, as to plaintiff's proposal in particular, the Agencies were not arbitrary and capricious in determining that Mr. Cutonilli's proposed alternative was infeasible.

### b. *Plaintiff's Alternative as within the Range of Alternatives Considered*

In the alternative, defendants argue that even if Mr. Cutonilli's alternative were reasonable, it did not warrant separate analysis because it was substantially similar to other alternatives considered in the preparation of the EIS. ECF 44-2 at 18-19, MTA Memo.; ECF 45-1 at 20-21, FTA Memo. Indeed, under NEPA, an agency need not perform a separate analysis of an alternative that is not "significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." *Westlands Water Dist. v. U.S. Dep't of Interior*,

44

376 F.3d 853, 868 (9th Cir. 2004) (citations and quotations omitted).  In the Agencies' view, plaintiff's alternative was within the spectrum of alternatives studied in detail.

Based on the Administrative Record, I conclude that the Agencies did not commit clear error by failing to consider plaintiff's proposal in greater depth, for the reasons advanced by defendants.  I explain below.

Throughout the Project's history, spanning more than a decade, the Agencies studied and considered numerous alignments and possible modes of transportation.  AR1_000006, ROD.  In particular, the 2008 AA/DEIS carried forward twelve possible alignments across four different alternatives for technical study.  *Id.*  Although heavy rail, AR1_001309, FEIS, and commuter rail, *id.* at AR1_001306, were not carried through for detailed study, the record shows that these modes were adequately considered and then eliminated from further study for appropriate reasons, including, as indicated, concerns related to technical feasibility and financial costs.  *See*, *e.g.*, AR1_000004, ROD; AR1_001309-AR1_001310, FEIS

As to plaintiff's hybrid proposal in particular, which incorporated both BRT and heavy rail technology, a similar hybrid alternative with a heavy rail component was analyzed and reasonably rejected.  ECF 44-2 at 18, MTA Memo; ECF 45-1 at 20-21, FTA Memo.  After due consideration, the Agencies concluded that the hybrid method was not viable due, *inter alia*, to: 1) "the increased travel time and decreased ridership resulting from the need to transfer to different modes for a single trip" and 2) "the need for additional maintenance facilities to handle the different modes of transportation used in the alternative."  ECF 44-2, MTA Memo.; *see* ECF 45-1 at 20-22, FTA Memo.; AR1_001309-AR1_001310, FEIS.  The Agencies' conclusion that Mr. Cutonilli's proposed hybrid alternative would suffer from the same limitations, given its use of multiple modes of transportation, does not suggest clear error.

Moreover, in addition to considering and then eliminating a similar hybrid proposal with a heavy rail component as an option, the individual components of Mr. Cutonilli's hybrid alternative—heavy rail and BRT—were studied individually.  As noted, given the popularity of heavy rail, its advantages and disadvantages were fleshed out at length in the FEIS and the related technical report.  *See* AR1_006655-688, FEIS, Appendix G, Heavy Rail Technical Report.  The other component of Mr. Cutonilli's alternative, BRT, was carried forward for technical study in the AA/DEIS and rejected.  *See* AR1_006248-AR1_006426, Alternatives Technical Report, Appendix D: Screening of Preliminary Alternative.  Because the two components of plaintiff's proposal were evaluated separately, the Agencies concluded that a separate analysis of these two modes of transportation as part of Mr. Cutonilli's alternative was not required.  ECF 44-2 at 16-17, MTA Motion; ECF 45-1 at 18, FTA Memo.; *see Westlands*, *supra*, 376 F.3d at 868.

Plaintiff concedes that there are similarities between his alternative and those that were considered in detail.  AR1_000889, FEIS Comment.   But, he argues that his proposal "differs in more ways than it is similar."  *Id.*   In his Opposition, plaintiff highlights five aspects of his alternative that, in his view, differentiate it from other alternatives that were evaluated by the Agencies.   He claims, in sum: 1) his alternative better addresses transit needs across the Baltimore region beyond the Corridor; 2) his alternative incorporates a "quickway" model of BRT,[32] which would increase public transit access outside the Corridor; 3) his alternative

---

[32] Quickway is a "primarily grade-separated (that is, fully segregated) busway capable of supporting express and all-stops operations."  *Advanced Network Planning for Bus Rapid Transit: "Quickway" model as Modal Alternative to "Light Rail Lite,"* Foreword at v, United States Department of Transportation, Federal Transit Administration, Report No. FL-26-7104-4, February 2008.  Stated differently, "a busway is a Quickway if a bus can traverse its length without being stopped or slowed by auto traffic, pedestrians, or buses which are loading or discharging passengers."  *Id.*

overlaps the different modes of transportation, "minimiz[ing] the need to transfer"; 4) his alternative does not require underground stations; and 5) his alternative has several potential variations, out of which the Agencies could have created a suitable alternative. ECF 47-1 at 5-6, Opposition. These arguments are unavailing.

First, plaintiff seems to suggest that a critical shortcoming of the LPA[33] is that it is not responsive to transit demand in the Baltimore region. Plaintiff explains in his Opposition: "Approximately 70% of the ridership of the LPA originates and/or ends outside of the corridor[,] which impacts the travel times, the ability to make transit more attractive and enhance transit system connections." ECF 47-1 at 5, Opposition (internal citations omitted). His FEIS Comment explains: "Based on the market analysis contained in the Travel Demand Methodology and Results, there is more travel outside the red line corridor to the red line corridor then there is within red line corridor itself. This indicates that the alternative should be optimized to improve transit access to these other regions in addition to travel within the corridor." AR1_000890, FEIS Comment.

This line of argument amounts to an attempt to redefine the purpose of the Project. As noted, an EIS begins with a brief statement "specify[ing] the underlying purpose and need to which an agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13; *see Alliance for Legal Action v. FAA,* 69 Fed. Appx. 617, 621–622 (4th Cir. 2003). If that statement is reasonable, a court defers to the agency's expertise and discretion in deciding the proposed action's objectives. *Alliance,* 69 Fed. Appx. at 622; *Audubon*, 524 F. Supp. 2d at 662. Here, in the statement of the Project's purpose and needs, the Agencies

---

[33] As indicated, the Agencies characterize the Preferred Alternative as a refined version of the LPA. AR1_001303, FEIS. It follows that, to a large extent, Mr. Cutonilli's challenges to the LPA are equally applicable to the Preferred Alternative.

reasonably limited the scope of the Project to improving public transit within the Corridor, AR1_000003, ROD (noting, *inter alia*, that the purpose of the Project is to "increase transit accessibility *in the corridor*" and to "[p]rovide transportation choices for east-west commuters *in the corridor* . . .") (emphasis supplied).  In this regard, even if, as Mr. Cutonilli contends, there are public transit deficiencies beyond the designated Corridor, the Agencies' decision to limit the geographic scope of the Project is entitled to deference.  NEPA "does not substantively constrain an agency's choice of objectives[.]"  *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *cf. Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) ("The determination of the region, if any, with respect to which a comprehensive statement is necessary requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility.  Resolving these issues requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies.") (citation omitted).

In a similar vein, plaintiff argues that his quickway model of BRT "would allow buses to access the areas where 70% of the ridership is forecasted to originate," outside the Corridor. ECF 47-1 at 5-6, Opposition.  In this way, he maintains that his alternative is superior to the other BRT alternatives considered because they were "confined to the corridor, which forces transfers for the majority of riders."  *Id.* at 6.   As with plaintiff's first argument, I reject his second argument on similar grounds.  The Agencies' decision to limit the Project's purpose to addressing needs within the Corridor is entitled to deference, and the Administrative Record does not suggest the statement of purpose was arbitrary and capricious.

Third, plaintiff contends his alternative warrants further consideration because it overlaps BRT and heavy rail modalities, minimizing the need for passengers to transfer between different

modes of transportation.   ECF 47-1 at 6, Opposition.   The potential effect a need to transfer has on ridership is one of the primary concerns that the Agencies identified with respect to hybrid models.   *See* AR1_001310, FEIS.

As indicated, MTA performed a technical analysis of heavy rail as a modal alternative in the Project corridor.   *See* AR2_100638, Scoping Process Report dated October 2004.   One of the two heavy rail alternatives analyzed was a hybrid model, which combined three modes of transportation—heavy rail, light rail, and streetcar. AR1_001310, FEIS.   Plaintiff proposes that his alternative is distinguishable from the hybrid analyzed, given the overlay of modes of transportation in his plan.   In his design, "[h]eavy rail occurs over the eastern half of the line from the West Baltimore MARC station, through downtown to Canton . . . ."   AR1_000890, FEIS Comment.   Mr. Cutonilli explains:   "BRT occurs over three quarters of the line from Social Security, through the West Baltimore MARC station, and ending downtown."   *Id.*   Although in this respect plaintiff's proposal is not identical to the hybrid model that was studied, a variation of one of the alternatives discussed in an EIS does not necessarily warrant further study or a separate cost-benefit analysis.   *See, e.g.*, *Sierra Club v. Van Antwerp,* 526 F.3d 1353, 1360 (11th Cir. 2008) ("When the change to the proposed action is a 'minimizing measure,' . . . the agency 'is not automatically required to redo the entire environmental analysis' . . . because a minimizing measure's effects on the environment will usually fall within the scope of the original NEPA analysis") (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1221 (11th Cir. 2002)).

In my view, the manner in which plaintiff attempts to differentiate his model from the heavy rail hybrid model previously studied does not warrant further study of his model because, as stated, BRT and heavy rail were studied in depth, independently and at great length, and were

reasonably eliminated.    Thus, plaintiff's proposal remains within the range of alternatives examined.

Fourth, plaintiff insists his alternative is distinguishable because, unlike other BRT models analyzed, his plan does not require underground stations.  ECF 47-1 at 6, Opposition.   In promoting his alternative, plaintiff argued, AR1_000893, FEIS Comment of January 28, 2013:

> An advantage this alternative has is that no underground stations are needed. If the maximum tunnel option with tunneled BRT is chosen, stations can still be constructed on the surface, with the highway exits serving as the method for bringing it to the surface and getting back down afterwards.

Five of the Preferred Alternative's nineteen stations are to be located underground. AR1_001333, FEIS.    Acknowledging this difference between plaintiff's proposal and the Preferred Alternative, the FTA argues: "While it is true that Plaintiff's proposal did not include underground stations, Plaintiff fails to acknowledge that his proposal would require construction of an extremely large, expensive tunnel in order to allow for the stations to be constructed on the surface."  ECF 51 at 9, FTA Reply.  In making this argument, the FTA suggests that any benefit from the lack of underground stations in plaintiff's alternative is diminished by the need to construct the Cooks Lane tunnel.

According to the MTA's correspondence with Mr. Cutonilli, included in the Administrative Record, construction of the 54-foot wide tunnel under Cooks Lane, necessary for plaintiff's model, would require acquisition and demolition of a large number of private commercial and residential properties, and would require shutting down the Metro from service for a year or more.  AR2_000001, MTA Emails of May 24, 2013.   In addition, construction of the tunnel, as proposed by plaintiff, does not appear to be a technically easy feat.  According to the MTA, it would be one of the largest tunnels of its kind ever constructed, and it would result in a substantial increase in the amount of excavated material, with a corresponding significant

increase in the cost of disposal.  *Id.* at AR2_000001-000002.

The parties' contentions as to the benefits of various tunnel and station configurations aside, I emphasize that it is not the court's role when reviewing a NEPA challenge to assess the virtue of such technical decisions, especially when plaintiff does not argue that in choosing to include underground stations the Agencies failed to examine the environmental consequences of their decision.  *See Webster, supra*, 685 F.3d at 425–26 (the court will not "intrude into [an agency's] decisionmaking prerogative" where inadequacies identified are trivial) (citation omitted).  The issue before the Court is not whether plaintiff's proposal was better than the Preferred Alternative, but rather whether it was materially different than other alternatives considered such that further study of the proposal was required under NEPA's implementation regulations.  Notwithstanding the exclusion of underground stations in plaintiff's plan, I conclude that given the prior analysis of a hybrid model and detailed consideration of various alignments over the course of ten years, the Agencies' decision not to examine his proposal further was not arbitrary and capricious.

Finally, plaintiff argues that, even if his alternative were unreasonable as proposed, his alternative had several potential variations, such as "deleting the highway portion" in order to "address the defendants [sic] issues with the cost of the alternative."  ECF 47-1 at 6, Opposition. Plaintiff suggests that, based on variations to his alternative, the Agencies could have created a satisfactory iteration of his proposal.  *Id.*  In this respect, plaintiff mischaracterizes an agency's obligations under NEPA.

NEPA does not require that agencies fashion a plan out of unfeasible alternatives or incomplete information.  *Friends of the Earth v. Coleman*, 513 F.2d 295, 298 (9th Cir. 1975) (holding that EIS did not have to consider alternative sites where plaintiffs failed to allege

specific evidentiary facts showing that the alternative sites were reasonable and viable). Indeed, as noted, the CEQ regulations require only that the an agency evaluate the reasonable alternatives presented to it and "briefly discuss" the reasons for eliminating proposed alternatives from detailed study. 40 C.F.R. § 1502.14(a). The Agencies have satisfied their obligation in this respect. Even if another decisionmaker might have reached a contrary result, it surely was not "a clear error of judgment" for the Agencies not to select plaintiff's alternative for detailed study in light of the cost of the variation presented to them and given the spectrum of alternatives that were evaluated in detail. *Friends of Back Bay*, *supra*, 681 F.3d at 587.

Moreover, "[i]n determining whether NEPA has been violated, [the court] must look to the ultimate harm NEPA seeks to prevent: the risk of damage to the environment that results if the agency fails to properly and thoroughly evaluate the environmental impacts of a proposed project." *Laguna*, *supra*, 42 F.3d at 527 (citation omitted). "Thus, even where there is a violation of NEPA's procedural requirements, relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met." *Id.* (citation omitted).

On this score, I emphasize that plaintiff does not suggest that the environmental consequences of the Project were not considered adequately. Nor does plaintiff allege that the Agencies, as the decision makers, were not fully informed as to the impact of the Project on the environment. For the foregoing reasons, plaintiff's claims as to the Agencies' inadequate evaluation of alternatives, including his, must fail.

### 3. Scientific Integrity

Plaintiff contends that, pursuant to 40 C.F.R. § 1502.24, "[t]he Defendants failed to insure the professional integrity, including scientific integrity of the discussions and analyses in environmental impact statements…." ECF 1 ¶ 2, Complaint. His primary challenge to the EIS

methodology appears to be that defendants failed to have their analysis reviewed by professional engineers.  ECF 47-1 at 7.

CEQ regulation 40 C.F.R. § 1502.24, upon which plaintiff relies, provides:

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

In my view, Mr. Cutonilli's challenge to the underlying science of the EIS appears to be a veiled attempt to challenge the ultimate selection of a Preferred Alternative.  As noted, the APA does not mandate a particular outcome.  *Robertson*, *supra*, 490 U.S. at 351.  It is a procedural statute, and the rationale for deference to the agency's discretion is particularly strong when it is deciding an issue within its realm of its technical expertise.  *See Webster, supra*, 685 F.3d at 425–26; *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) ("The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise. . . .") (citation omitted and alteration in *Kempthorne*).

Moreover, the Administrative Record is replete with technical studies and analyses upon which defendants relied in preparing the EIS.  For example, the EIS reflects the Agencies' reliance on an examination of various issues, including ridership, regional travel patterns, air quality, and cost projections, to name a few. *See* AR1_001258-001295, FEIS; AR1_009247-009254, AA/DEIS.  Moreover, with respect to engineers, the list of preparers for the EIS includes several licensed members of the profession. AR1_003051-003055, FEIS, Appendix B, List of Preparers.

Plaintiff's vague contentions on the subject of scientific integrity serve to underscore the extent to which his criticisms of defendants' analysis are technical, methodological disagreements.  "The mere fact that [a plaintiff] disagrees with [an agency's] methodology does

not constitute a NEPA violation." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012). When faced with a technical or scientific disagreement, a court "may not insert [its] opinions in the place of those of [the experts]." *Id.* To the contrary, the court is "required to apply the highest level of deference in [its] review of the [agency's] scientific judgments in selecting [a given] methodology." *Id.* (citation omitted). Put another way, it is "not [my] role to weigh competing" expert analyses. *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 659 (9th Cir. 2009); *see id.* at 658-59 ("We grant considerable discretion to agencies on matters 'requir[ing] a high level of technical expertise.'") (citation omitted); *see Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (stating that a court is "most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science"); *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (noting that courts should conduct a "'particularly deferential review'" of an "'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable'") (quoting *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594 (1981)); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (citations omitted).

Accordingly, I conclude that plaintiff's vague challenge to the professional integrity of the EIS is not supported by the Administrative Record, nor does it render the Agencies' methodology arbitrary or capricious.

### 4. Supplementation

To the extent plaintiff argues supplementation to the EIS was required based on refinements to his proposed alternative submitted to the Agencies for consideration, this contention is without merit. *See* ECF 47-1 at 9-10, Opposition. "Federal agencies are not obligated to restart the NEPA process every time new information becomes available."

*Audubon*, *supra*, 524 F. Supp. 2d at 674 (citation omitted).  Indeed, "an administrative process can never come to an end if the process must begin again every time new information is available." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981). Accordingly, the CEQ regulations only mandate that a federal agency prepare a supplemental environmental impact statement if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i)-(ii); *see N.C. Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 698 (M.D.N.C. 2001) (stating if circumstances or information arise that "present a seriously different picture of the environmental impact of the proposed project from what was previously envisioned," an agency must supplement its environmental impact statement) (internal quotes and citation omitted).

Here, beyond minor refinements to his proposed alternative, Mr. Cutonilli did not submit "significant new circumstances or information relevant to environmental concerns" that would require supplemental environmental analysis.  *See* 40 C.F.R. § 1502.9(c)(1); *Webster*, *supra*, 685 F.3d at 418; *Hodges v. Abraham*, 300 F.3d 432, 438-39 (4th Cir. 2002).  Therefore, this claim must fail.

### 5.  Public Participation

Plaintiff argues that in several ways the Agencies violated NEPA's public participation requirements.  His primary contentions appear to be that (a) the Agencies failed to respond adequately to his comments on the EIS; (b) the Agencies failed to publish his written comment on DEIS in the FEIS; and (c) the Agencies failed to provide certain documentation in response to his requests for information.  ECF 47-1 at 7-8, Opposition.

### *a.   Response to Plaintiff's Comments*

Mr. Cutonilli seems to take issue with how or whether the Agencies replied to his comments as to the EIS.   He alleges that the Agencies failed to provide sufficient detail or reference the supporting analysis upon which they relied in determining not to evaluate further his proposed alternative.   ECF 47-1 at 7-8, Opposition.   He also questions whether defendants "even evaluated the plaintiff's comments [on the FEIS rather than] simply reiterat[ing]" the same response to his comments on the DEIS.   ECF 1 ¶ 28, Complaint.

To be sure, "In preparing the final EIS, the agency must 'discuss at appropriate points . . . any responsible opposing view which was not adequately discussed in the draft statement and [must] indicate the agency's response to the issue raised.'" *Robertson,* 490 U.S. at 350 n.13 (quoting 40 C.F.R. § 1502.9(b)) (alterations in original); 40 C.F.R. § 1503.4(a) ("An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond . . . in the final statement.").   Notwithstanding this obligation, the mere presence of expert disagreement does not mandate a response in the final EIS or the record of decision.

Under 40 C.F.R. § 1503.4, the agency has a variety of options in how to respond appropriately to a comment received pm the EIS.   The agency may, 40 C.F.R. § 1503.4(a):

> (1) Modify alternatives including the proposed action.
> (2) Develop and evaluate alternatives not previously given serious consideration by the agency.
> (3) Supplement, improve, or modify its analyses.
> (4) Make factual corrections.
> (5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

In correspondence to Mr. Cutonilli, the MTA explained why it deemed his alternative not

feasible and why further analysis was not required.   *See, e.g.*, AR2_000001-000004, MTA

Emails of May 24, 2013; AR2_052061, Email Correspondence dated July 29, 2010, between

Lorenzo Bryant, Project Manager, MTA Office of Planning, and Mr. Cutonilli.   Although the

MTA did not cite to particular authorities, it did articulate with clarity the basis for its decision

not to carry forward Mr. Cutonilli's alternative for further study—namely, the projected cost of

the alternative, its operational challenges, and the effect on ridership resulting from the need with

his plan to transfer between modes of transportation.   *See e.g.*, AR2_000001-000004, MTA

Emails of May 24, 2013.   An articulation of supporting reasons without a citation to any

scientific authority is satisfactory under 40 C.F.R. § 1503.4 (noting an agency shall "explain why

the comments do not warrant further agency response, citing the sources, authorities, or reasons

which support the agency's position…").,

### b.   *Publication of Plaintiff's Comments*

Plaintiff also complains that although his Oral DEIS Comment was included in the FEIS,

his Written DEIS Comment, submitted on November 6, 2008, was not published in the FEIS.

ECF 47-1 at 8, Opposition; *see* AR2_066106-066110, Written DEIS Comment; AR1_002388-

002389, Oral DEIS Comment (included in the FEIS).   There is no merit to this complaint.

NEPA does not require an agency to publish "every comment ... in the final EIS.   Nor

must an agency set forth at full length the views with which it disagrees." *California v. Block,*

690 F.2d 753, 773 (9th Cir. 1982) (internal citations omitted).   Rather, 40 C.F.R. § 1503.4

provides: "All substantive comments received on the draft statement (*or summaries thereof*

where the response has been exceptionally voluminous), should be attached to the final statement

whether or not the comment is thought to merit individual discussion by the agency in the text of

the statement." (Emphasis supplied).

Although Mr. Cutonilli's Written DEIS Comment, submitted on November 6, 2008, does not appear in the FEIS, as noted, Mr. Cutonilli's Oral DEIS Comment, made on the same date, November 6, 2008, was included.  It could reasonably be construed as a summary of all of his comments that day.  *Compare* AR2_066106-066110, Written DEIS Comment *with* AR1_002388-002389, Oral DEIS Comment (included in the FEIS).

Summaries of comments have been deemed appropriate under NEPA.  To illustrate, in *WildWest Inst. v. Bull*, 547 F.3d 1162, 1170 (9th Cir. 2008), the Ninth Circuit determined that a final EIS responded appropriately to public comment when it summarized the nature of the comments it had received and the primary concerns that were raised.  The final EIS also "provided specific substantive responses to such concerns and included a six and a half page list of the commenters." *Id.*  The *WildWest* Court ruled that this was sufficient to satisfy NEPA. *Id.*

In view of the foregoing, defendants have acted accordingly.  Mr. Cutonilli's Oral DEIS Comment was included in the FEIS.  AR1_002388-002390, FEIS.  The Agencies also included in the FEIS their response to plaintiff's proposed alternative. *Id.*  In their response, the Agencies informed Mr. Cutonilli that his option was "infeasible from a capital cost standpoint" because the "BRT portion of [Mr. Cutonilli's] alternative would require a very expensive 45-foot diameter tunnel under Cooks Lane and would also require all passengers to transfer from BRT to heavy rail, increasing transit travel times and decreasing ridership."  AR1_002388, FEIS.

That the Agencies did not include in the FEIS Mr. Cutonilli's Written DEIS Comment of November 6, 2008, supplementing his oral testimony, is of no moment because the thrust of Mr. Cutonilli's proposed alternative is captured in the oral testimony.  And, summaries of comments are adequate when the primary concerns raised by the comments are addressed.  Moreover, as previously noted, "[i]n conducting this review, we may not flyspeck [the] agency's

environmental analysis, looking for any deficiency, no matter how minor." *Webster*, 685 F.3d at 421 (quotation omitted).   As a result, the Agencies' decision not to include in the FEIS Mr. Cutonilli's written comment of November 6, 2008, was not arbitrary, capricious, or clearly erroneous.

### c.  *Plaintiff's Requests for Information*

Finally, plaintiff seems to suggest that some of his correspondence amounted to public requests for information, to which the Agencies failed to respond.   He explains:  "The plaintiff contacted the MTA for additional information they [sic] had on their analysis of [his] proposal, but was ignored by the MTA.   The plaintiff then filed a public information act request for information."  ECF 1 ¶ 18, Complaint.   Plaintiff contends:  "The public information act did not produce any documents that demonstrated that the MTA actually evaluated my proposal.   They produced some emails that the plaintiff had sent them, an analysis of a heavy rail alternative, and an evaluation of sharing the existing metro downtown tunnel with a potential light rail alternative."  *Id.* ¶ 19.

Yet, in the Complaint, plaintiff does not suggest that the MTA failed to respond or was untimely.   Rather, he seems to challenge only that he was dissatisfied with the materials MTA sent to him—"some emails" but no evidence of the MTA's evaluation of his proposal.  *Id.*  In his view, the Agencies' response was inadequate.  *Id.*

To supplement his information request claims, in his Opposition, plaintiff supplies additional detail on these claims.   He explains, ECF 47-1 at 9-10, Opposition:

> The plaintiff has attempted to obtain public information from the defendants on numerous occasions[.]  On 20 January 2010 the plaintiff submitted a written request for information (AR2_056156) that qualifies as a Maryland public information act request, but the defendants did not respond with the requested information (AR2_054357-054358), in violation of 40 CFR

1506.6(f)[.][34]   The plaintiff submitted another written request for information on 26 April 2010 (AR2_052061-052062).   The defendants did not respond within the required 30 days id [sic] and the record does not indicate which documents were provided to plaintiff.   It appears that the response to this request was driven by a third written request for information submitted on 28 May 2010 (AR2_053126).

Notably plaintiff does not explicitly mention the Freedom of Information Act or the Maryland Public Information Act.   However, he does refer to 40 C.F.R. § 1506.6(f), which provides that agencies must:

> [m]ake environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

Plaintiff's claims in connection with his public information requests must fail because in his Complaint, he does not allege that the Agencies failed to provide him with "environmental impact statements, the comments received, and any underlying documents . . . ."   *Id.*   Moreover, in his Complaint, he does not allege the Agencies failed to respond timely fashion.   Rather, his Complaint indicates only his dissatisfaction that no response from the Agencies afforded him the relief he desired—a detailed analysis of his proposed alternative.   As the MTA suggests, a technical analysis of plaintiff's proposal appears to be Mr. Cutonilli's "singular end."   ECF 50 at 19, MTA Reply.   Notwithstanding the zeal with which Mr. Cutonilli pursued a detailed analysis of his alternative or an in-depth explanation from the Agencies for their refusal to perform such an analysis, the CEQ regulations require only that an agency "briefly discuss" the reasons for

---

[34] In the Opposition, plaintiff's challenges related to public requests for information seem to be lodged against both defendants, whereas in the Complaint, the facts related to requests for information seem relevant only to the MTA.   ECF 1 ¶ 20, Complaint.   Given my disposition of this issue, as discussed, *infra*, this discrepancy is not material.

eliminating proposed alternatives from detailed study.   40 C.F.R. § 1502.14(a).  The Agencies have fulfilled this requirement.

### III.    CONCLUSION

In sum, the Agencies have satisfied their obligations under NEPA as to Mr. Cutonilli's proposed alternative and the comments he submitted to the EIS.  Even if another decisionmaker might have reached a contrary result, it surely was not a clear error of judgment, or arbitrary and capricious, for the Agencies not to select plaintiff's alternative for detailed study or to decline to respond to Mr. Cutonilli's proposed alternative in greater detail.  In conclusion, I emphasize that this decision does not serve as an affirmation of the wisdom of the Red Line Project, as that issue was not before the Court.  An Order follows, consistent with this Memorandum Opinion.


Dated: <u>March 30, 2015</u>                              <u>        /s/          </u>

                                                          Ellen Lipton Hollander
                                                          United States District Judge

**APPENDIX A**
**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AA/DEIS | Alternatives Analysis/Draft Environmental Impact Statement |
| BRT | Bus Rapid Transit |
| BRTB | Baltimore Region Transportation Board |
| CEQ | Council on Environmental Quality |
| CMS | Centers for Medicare and Medicaid Services |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FTA | Federal Transit Administration |
| LPA | Locally Preferred Alternative |
| LRT | Light Rail Transit |
| LRTP | Long-Range Transportation Plan |
| MTA | Maryland Transit Administration |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| TSM | Transportation System Management |
| SAAC | Station Area Advisory Committees |